## CITY OF OWATONNA v. INTERSTATE POWER CO. et al.
## No. 426.

District Court, D. Minnesota, First Division.

April 29, 1936.

Leach & Leach, of Owatonna, Minn., for plaintiff.

Brown, Somsen & Sawyer, of Winona, Minn., for Interstate Power Co.

Kyle & Kyle, of St. Paul, Minn., for Donovan Construction Co.

NORDBYE, District Judge.

The controlling facts and circumstances of this controversy, concerning which there is no marked dispute, may be stated as follows:

On January 29, 1927, the City of Owatonna and the Donovan Company entered into a contract for the sale and purchase of electrical energy, the pertinent provisions of which may be thus summarized:

Article (1) of this agreement provides:

"The Company hereby agrees to purchase and the City agrees to sell all electrical energy to the Company required for the purpose of service by the Company to the farms which can be served satisfactorily within a reasonable radius of the city of Owatonna. It is mutually understood by and between both parties to contract that this agreement shall constitute an exclusive right granted by the City to the Company to serve all customers applying for rural service within said district. * * *"

Article (2) of the contract provides that the rate to be paid for such electrical energy shall be on the basis of three cents per kilowatt hour—

"For all such energy consumed in each and every calendar month after said electrical connection has been made. * * * The aforementioned rate is based on a coal cost at the switchboard of one cent per kilowatt hour to the City, but should said cost, by virtue of increased price of fuel become higher than the said coal cost herein mentioned, the said cost of electrical energy to the Company by the City shall be raised on a proportionate basis; but should said coal cost decrease below that cost aforementioned, said cost of electrical energy shall be decreased proportionately. * * *"

Article (3) of the contract provides that the energy shall be metered by a meter to be installed by the company at the light plant of the city, which point shall constitute the point of delivery.

Article (4) provides for the installation by the company of the necessary instrumentalities to conduct the energy from the plant to a point adjacent to the city limits. The article then provides that from such point the company shall construct and maintain in the adjacent rural community single phase lines.

Article (5) provides that the aforesaid rural lines shall be of a high class of electrical construction.

Article (6) provides that the duration of time for the purchase by the company from the city of said electrical energy shall be construed as being 20 years after the commencement of such service. This article gives the city the right to discontinue in the event of default in payment of invoices by the company for more than 90 days, or in case of the company's inability to operate and maintain the system in a high-grade manner. It also gives the company the right to terminate the contract if the city fails to live up to the terms thereof. It also provides that in case of either contracting party desiring cancellation, 60 days' notice shall be given to the other.

Article (7) provides that this agreement shall not be assigned by the company unless the assignee shall be accepted by the city.

Article (8) provides: "Provided, however, that the contract can be voided by the City at any time during its life should quantity demanded by the Company necessitate the purchase of new turbine or other expensive equipment; option in that regard to rest entirely with the City, at which time new arrangement will be made that will be mutually satisfactory to both parties of this contract."

It is conceded that at the time the contract was consummated, the Donovan Company did not own any lines in the vicinity of Owatonna, nor had it any established business requiring the use of electrical energy. The parties to the contract had no means of knowing the success with which the Donovan Company would meet in proceeding with the establishment of the contemplated rural lines. Its require-

ments in this venture could not be determined or predicted. The evidence indicates that it was not until August, 1927, that the Donovan Company had built lines and obtained customers, and at that time it commenced to take electrical energy from the city under the contract. It appears that the rural lines were extended from time to time and the requirements of the Donovan Company for electrical energy consequently increased. In April, 1930, the company sold and transferred the so-called Owatonna Rurals system to the Peoples Service Power & Light Company, hereinafter called the Peoples Company. On November 16, 1931, the lines were transferred by the Peoples Company to the Interstate Company. The testimony is undisputed that the city had no direct dealings with the Interstate Company, and knew nothing of its connection or interest in the lines until after January, 1933. It must also be conceded that the city did nothing in reliance on the ownership or interest of the Interstate Company in the Owatonna Rurals, nor is there any evidence that the Interstate Company ever held out to the city that it had assumed the electrical energy contract. On the contrary, the record impels the finding that the Interstate Company studiously refrained from assuming the contract and made temporary arrangements to purchase energy through the Peoples Company until it could obtain energy from its own system. That is, the Interstate Company had its own power plant at Albert Lea, Minn., at the time of the purchase of the Owatonna Rurals, and contemplated the use of its own power in supplying the newly-acquired system.

In the written contracts between the Peoples Company and the Interstate Company, there is no express assumption of the contract in question, nor is there any assignment of the contract from the Peoples Company to the Interstate Company. The city, of course, being unaware of the interest of the Interstate Company in these lines, cannot urge estoppel, and there is an utter absence of any testimony to sustain a finding of novation. Not only is there no express assumption on the part of the Interstate Company to be bound by this contract, but the evidence falls far short of establishing an implied assumption. The mere fact that the Owatonna Rurals were sold to the Interstate Company does not give rise to any presumption that the transfer included the contract for electri-

cal energy. This contract was not an inherent part of the right to own or operate the lines during the 20-year period. There was no restriction upon the right or authority of the Donovan Company to sell all or any part of the distribution system that might be built as contemplated by the agreement. The fact that the Donovan Company never formally assigned the contract to the Peoples Company may not be an important circumstance, and even though it may be assumed that the Peoples Company could have assigned the contract, it is clear that, not only did it not intend to assign the same to the Interstate Company, but the Peoples Company did not, in writing or otherwise, assign or transfer the contract, nor was any evidence offered which even remotely indicated that the Interstate Company agreed to assume or be bound by the electrical energy contract.

Plaintiff places considerable reliance upon the case of Imperial Refining Co. v. Kanotex Refining Co. (C.C.A.) 29 F.(2d) 193, but that case is clearly distinguishable. The original contract was between the Fern Oil Company and the Imperial Company, and the transfer of the contract specifically delegated to the assignee, the Kanotex Company, all the duties and obligations imposed by the original contract upon the assignor. It appears that the assignee defaulted, and the assignor was sued by the Fern Oil Company. Judgment was recovered and the Imperial Company sued the Kanotex Company on the express assumption by it of the duties and obligations of the contract.

In the case at bar, the transfer of the lines to the Interstate Company neither delegated nor imposed any duty upon the grantee with reference to the electrical energy contract, nor is there any evidence that there was any intention on the part of the grantor to saddle upon the Interstate Company the burdens of the contract. Surely, a bare assignment of the physical property did not carry with it the contract. The fact that the contract itself provided that there should be no assignment without the consent of the city negatives any such presumption. In that the transfer of the Owatonna Rurals to the Interstate Company did not create any personal liability on the part of the vendee with reference to the contract in question, it necessarily follows that the plaintiff cannot recover as against this defendant. Mound Valley Vitrified Brick Co. v.

Mound Valley Natural Gas & Oil Co. et al. (C.C.) 258 F. 936; Urban v. Phy (C.C.A.) 24 F.(2d) 494; Pioneer Loan & Land Co. v. Cowden, 128 Minn. 307, 150 N.W. 903; Racine Engine & Machinery Co. v. Confectioners' Machinery & Mfg. Co. (C.C.A.) 234 F. 876.

The Donovan Company, as well as the Interstate Company, urges that the contract herein cannot be enforced because (1) it is void for lack of mutuality; (2) it is void for lack of certainty; (3) it is illegal because it violates the requirements of law that plaintiff, a municipal corporation, serve all alike, in that the contract purports to give the Donovan Company a monopoly; (4) it is ultra vires and beyond the power of the plaintiff; and (5) there has been no breach.

Under Mason's Minnesota Statutes 1927, § 1765-1, a municipality may sell its surplus electrical energy, the statute providing that the city "shall be authorized and empowered to dispose of any surplus electricity so produced to private consumers desiring the same residing outside the corporate limits of said city." The Donovan Company was not a private consumer of electricity. It was in the business of furnishing electrical power to private consumers. The city, under the statute, did not have an unlimited right to sell electricity. Its first duty of course, was to serve consumers within its own corporate limits. It was only the surplus power produced that could be sold to outside private consumers, but, assuming that the contract was not ultra vires by reason of the fact that the Donovan Company did not come within the category of a private consumer, there are other objections urged that must be sustained, and which clearly render the contract unenforceable. As stated before, when the contract was entered into, the Donovan Company had no lines constructed or under construction whereby it could service the farmers in the vicinity of Owatonna. It was impossible to forecast or predict the requirements of the company. Undoubtedly, it was contemplated that the Donovan Company should construct rural electric lines dependent upon the success that it had in this enterprise, but the extent of the lines, or the minimum requirements, were not stated in the contract, and the company could have constructed one mile or one hundred miles of lines, and in either event would have complied with the agreement. It is true that the contract provides that the duration of time for the purchase by the company from the city of the electrical energy should be construed as being 20 years after the commencement of the service, but any expectation on the part of the contracting parties that there would be requirements for 20 years, is not tantamount to a duty resting upon the company to require electrical energy for that period of time, particularly where the company had no established business, and hence no requirements. If the project met with success, the requirements of the company would be different from those which would exist if the enterprise proved to be unprofitable. Presumably, if the company built lines, but the farmers refused to purchase electricity, or if perchance another company came into the field so that the entire venture became a failure, it could not be gainsaid, under this contract, that the Donovan Company would have the right to abandon its lines. In other words, if the maintenance of the entire system resulted in a loss or burden to the Donovan Company, it would seem that the company could withdraw from the entire system and refuse to purchase any electrical current from the city without breaching its contract. Therefore, as one analyzes the contract, the amount of electrical current to be furnished depended entirely upon the will and wants of the company.

The agreement entered into amounted to a so-called requirement contract, depending entirely upon the future needs of the company, that at the time of the making of the contract could not be foreseen or determined. It might be successful in getting many rural customers, or it might meet with utter failure. The fact that in January, 1933, the Owatonna Rurals consisted of many miles of lines, and that it served many customers and its requirements at that time could be determined, is not controlling. The validity of the contract must be determined as of the time it was entered into. At that time, the requirements of the company depended entirely upon its own desires, upon its own wants and needs, and in light of the weight of authority, the agreement must be held void for uncertainty and lack of mutuality.

Probably the leading case which considers contracts comparable to the one herein, is the case of Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co. (C.C.

A.) 114 F. 77, 57 L.R.A. 696. In this case, the court considered a contract which consisted of a written offer to deliver manufactured articles in unnamed quantities for a definite period of time. The order was accepted. The court, however, in finding the contract void and unenforceable, stated (page 79 of 114 F., 57 L.R.A. 696):

"The answer contains no averment that either the plaintiff or the defendant paid any consideration or performed any act to induce the contract, except the remitting of the offer by the plaintiff, and the sending of its acceptance by the defendant. There was therefore in the inception of this alleged agreement no consideration for the promise of either of the parties to it, except the promise of the other. Neither the letter nor the acceptance names any quantity or amount of the articles specified that is to be delivered or received under it. The plaintiff does not agree to deliver, nor does the defendant contract to receive or pay for, any quantity or amount whatever of the articles named in the writings. A promise is a good consideration for a promise. But no promise constitutes such a consideration which is not obligatory upon the party promising. It must bind the promisor, so that the promisee may maintain an action for its breach, or it is without legal effect and void. A promise to furnish, deliver, or receive specified articles at certain prices, without any agreement to order or to accept any amounts or quantities of the articles, ·is without binding force or effect, because neither party is thereby bound to deliver or to accept any quantity or amount whatever. Such promises are void, because they lack one of the essential elements of an agreement,—certainty in the thing to be done. Contracts for the future supply during a limited time of articles which shall be required or needed or consumed by an established business, or used in the operation of certain steamships or other machinery, are no exceptions to this principle, because they fall under the rule, 'Id certum est quod certum reddi potest.' But an accepted promise to furnish goods * * * in such quantities as the acceptor shall require or want in his business, is without consideration and void, because the acceptor is not bound thereby to require or take any articles whatever. under the supposed agreement. The line of demarcation between valid and invalid contracts here runs between the requirements of machinery, or of an established business, and the wants, desires, or requirements of the tentative vendee; and that because the former are either reasonably certain, or may be made so by evidence, while the latter are conditioned by the will of the tentative vendee alone, and are both uncertain and capable of infinite variation. * * *

"The rules applicable to contracts of this class may be thus briefly stated: A contract for the future delivery of personal property is void, for want of consideration and mutuality, if the quantity to be delivered is conditioned by the will, wish, or want of one of the parties; but it may be sustained if the quantity is ascertainable otherwise with reasonable certainty. An accepted offer to furnish or deliver such articles of personal property as shall be needed, required, or consumed by the established business of the acceptor during a limited time is binding, and may be enforced, because it contains the implied agreement of the acceptor to purchase all the articles that shall be required in conducting his business during this time from the party who makes the offer. [Citing cases.] But an accepted offer to sell or deliver articles at specified prices during a limited time in such amounts or quantities as the acceptor may want or desire in his business, or without any statement of the amount or quantity, is without consideration and void, because the acceptor is not bound to want, desire, or take any of the articles mentioned. [Citing cases.] Accepted orders for goods under such void contracts constitute sales of the goods thus ordered at the prices named in the contracts, but they do not validate the agreements as to articles which the one refuses to purchase, or the other refuses to sell or deliver, under the void contracts, because neither party is bound to take or deliver any amount or quantity of these articles thereunder."

See, also, Crane v. C. Crane & Company (C.C.A.7) 105 F. 869; T. B. Walker Mfg. Co. v. Swift & Co. (C.C.A.5) 200 F. 529, 43 L.R.A.(N.S.) 730; Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory, 231 N.Y. 459, 132 N.E. 148, 24 A.L.R. 1348; Nassau Supply Company v. Ice Service Company, 252 N.Y. 277, 169 N.E. 383.

■ But there are other circumstances that render this contract indefinite and uncertain. Under the statute, the city

could only sell its surplus electricity. The term "surplus" necessarily cannot be a fixed or definite supply. The city may have a surplus to-day and none to-morrow. The needs of the city may increase, or other limitations upon its total production of electrical energy may occur so that there is no available energy to sell. In fact, whether or not there was a surplus of electrical energy produced remained entirely with the city. Under the contract, it was not required to maintain any number of turbines or other equipment. It will be further observed that, by Article (8) of the contract, the agreement could be voided by the city at any time, should the quantity of electrical current demanded by the company necessitate the purchase of a new turbine or other expensive equipment. The contract thereby continued in effect only so long as the city elected to be bound.

The rights of the Donovan Company under this contract are enveloped in doubt, vagueness, and uncertainty. The city is bound only so long as the requirements of the company are not a burden to it. The contract is silent as to the number of turbines in operation or reserve on the day that the agreement was entered into. Turbines do not last indefinitely. Wear and tear presumably will cause them to be out of service. Increased demands will require more producing equipment. In fact, the evidence indicates that even now the demands on this municipal plant are such that at certain times of the year it is advisable for the company to install an extra turbine as a reserve unit. No one can say whether the contract will bind the city for 5 months or 5 years. It rests entirely within the discretion of the plaintiff whether or not new equipment should be purchased, and if the city determines that the purchase of new expensive equipment is entirely due to the quantity of electrical energy demanded by the Donovan Company, the latter cannot question the city's right to cancel the contract. Nebraska Gas & Electric Company v. Stromburg (C.C.A.8) 2 F.(2d) 518; Oakland Motor Car Company v. Indiana Automobile Co. (C.C.A.7) 201 F. 499.

The Donovan Company no longer owns the rural lines. It has no further requirements for the use of electrical energy in that vicinity. It disposed of its lines in a bona fide transaction to a company which has made other arrangements for its electricity. The city cannot now complain if the Donovan Company no longer has any need for electrical current. It did not agree with the city that it would have requirements for 20 years, and it can hardly be urged that the company could, if it became necessary, reduce its requirements to one customer, but could not, under the contract, abandon or sell the entire system. The court must construe the contract and the rights of the parties with reference thereto. It cannot remake the contract for the parties.

In view of the foregoing, the court does not find it necessary to discuss at any length, or to determine whether the contract was illegal or ultra vires. However, it may be stated in passing that even though there was an enforceable breach of this contract, the damages under the evidence would be so speculative and uncertain that no finding in excess of nominal damages could be sustained. The second cause of action alleges a conspiracy to breach the contract, but the evidence falls far short of sustaining it.

Let this memorandum be made a part of the foregoing findings of fact and conclusions of law.