## NEBRASKA GAS & ELECTRIC CO. v. CITY OF STROMSBURG, NEB.*

(Circuit Court of Appeals, Eighth Circuit. November 21, 1924.)

No. 6587.

1. **Constitutional law** ⊕⇒205(2)—**Electricity** ⊕⇒11—**Gas** ⊕⇒14(1)—**Statute empowering city to make irrevocable contract for 20-year term held constitutional.**

Rev. St. Neb. 1913, § 5019, empowering city of second class to make irrevocable contract with gas and electric company fixing maximum rates for term of 20 years, *held* not violative of Const. Neb. art. 1, § 16, forbidding Legislature to make "any irrevocable grant of special privileges."

2. **Courts** ⊕⇒366(1)—**Federal court must accept state Supreme Court's construction of state Constitution.**

Federal court must accept state Supreme Court's construction of state Constitution.

3. **Electricity** ⊕⇒11—**Gas** ⊕⇒14(1)—**Statute held to empower city to make irrevocable contract fixing gas and electric rates for period.**

Rev. St. Neb. 1913, § 5019, authorizing city of second class "to grant a franchise" for period not exceeding 25 years to gas and electric company, fixing "amount that may be charged during such period for such gas or electricity," and providing that city after termination of such period may make "any reasonable regulation" as to charges, empowered city to make contract with gas and electric company fixing irrevocable rates for term of 20 years, and did not merely grant power of regulation, in view of Comp. St. 1909, § 1708.

4. **Electricity** ⊕⇒11—**Gas** ⊕⇒14(1)—**Equity will not relieve from confiscatory rates fixed by contract between public utility corporation and city empowered to contract.**

Equity will not give relief from confiscatory rates fixed by valid contract between a public utility corporation and a city authorized to contract as to rates, since in such case the right to enforce the rates agreed on is controlled by the obligation of the contract.

5. **Electricity** ⊕⇒11—**Gas** ⊕⇒14(1)—**City's contract with public utility fixing rates construed as other contracts.**

Valid contract between city and gas and electric company, fixing rates for certain period, entered into pursuant to Rev. St. Neb. 1913, § 5019, must be construed by the same rules of construction as any other contract.

6. **Contracts** ⊕⇒10(1)—**Rule as to want of "mutuality" stated.**

"Mutuality" is lacking in a contract when only one of the contracting parties is bound to perform, and the rights of the parties exist at the option of one only.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Mutuality of Contract.]

7. **Electricity** ⊕⇒11—**Gas** ⊕⇒14(1)—**City's contract with gas and electric company fixing maximum rates held void for want of mutuality.**

Contract between city and gas and electric company, fixing maximum rates for 20-year period, under Rev. St. Neb. 1913, § 5019, and giving the city the right at four different times during such period, on specified dates, to move for a revision of such rates, *held* void for lack of mutuality as to provisions fixing maximum rates.

8. **Contracts** ⊕⇒57—**Contract having no consideration, save mutual promises, must be bilateral.**

A contract having no consideration, save mutual promises, to uphold it, must be bilateral.

9. **Evidence** ⊕⇒83(1)—**Officers presumed to have properly performed duties.**

Officers are presumed to have properly performed their duties.

10. **Electricity** ⊕⇒11—**Gas** ⊕⇒14(1)—**Invalid contract between city and gas and electric company fixing maximum rates not enforced on theory of partial performance.**

Contract between city and gas and electric company, fixing maximum rates during certain period and giving city right to move for revision at four stated times during the period, void for lack of mutuality, will not be enforced against company on theory that it has been partially performed by company, since city has not been misled, and doctrine of estoppel does not apply.

Lewis, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Nebraska; Thomas C. Munger, Judge.

Suit by the City of Stromsburg, Neb., against the Nebraska Gas & Electric Company. Decree for plaintiff, and defendant appeals. Reversed and remanded, with directions.

George A. Lee, of Omaha, Neb., and W. L. Kirkpatrick, of York, Neb., for appellant.

John C. Martin, of Central City, Neb. (E. E. Stanton, of Stromsburg, Neb., on the brief), for appellee.

Before SANBORN and LEWIS, Circuit Judges, and FARIS, District Judge.

FARIS, District Judge. The appellee, as plaintiff below, brought this action against appellant to enjoin it from failing and refusing to conform its rates charged for electricity furnished to the inhabitants of appellee to those prescribed by a certain franchise ordinance passed by said city on the 3d day of April, 1917, and duly accepted by the Public Service Company, the predecessor of appellant, and for an accounting for alleged excessive rates theretofore collected. For brevity and convenience, the appellant will be hereinafter re-

*Rehearing denied March 16, 1925.

ferred to as the "company" and the appellee will be called the "city." The trial court found the issues for the city, and entered a decree requiring the company to conform its rates as prayed, and that it account for and pay back all moneys collected by it, under a certain surcharge of 25 per cent. over the rates fixed by the franchise ordinance, which surcharge had been made and collected, pursuant to the alleged authority of a motion made and carried in the city council on the 16th day of March, 1920. From the above decree the company appealed in the conventional manner.

The answer of the company, among other things, set up a counterclaim, wherein the power of the city to enter into the contract, made by the city with the company and embodied in the franchise ordinance, was attacked as invalid (a) for alleged lack of authority under the statutes of Nebraska to make such a contract; and (b) because such ordinance is by its own terms lacking in mutuality, and therefore void and unenforceable. This counterclaim also alleged that the rates fixed by the ordinance had become and were confiscatory by reason of the increase in the price of labor and of all other things which enter into the production of electrical current, and that such fact that the ordinance rates were confiscatory was duly and formally ascertained by the city council, which body thereupon passed the above-mentioned motion authorizing the company to add a surcharge of 25 per cent. to the rates fixed by the ordinance. In passing it may as well be said that afterwards, and as of the 1st day of November, 1921, the city council by resolution rescinded its former action, which authorized the surcharge, and again adopted, or attempted to adopt, the schedule of rates prescribed in the ordinance. This counterclaim, which prayed for relief against alleged confiscatory rates and for an injunction, was dismissed by the court on final hearing, and largely the errors complained of are bottomed upon this fact, since all of the propositions now contended for by appellant are pleaded in the counterclaim at great length, and with admirable clearness.

The franchise ordinance so passed by the city and accepted by the company's predecessor, fixed by section 6 thereof the maximum rates which might be charged by the company to the inhabitants of the city for electric current for lighting purposes, at a graduated, but fixed, scale between and including 12 cents per k. w., where the current used was more than 1 k. w. and not exceeding 15 k. w. per month, and not to exceed 5 cents per k. w. when the current used was 75 k. w. or more per month. In this schedule of rates there was provided a deduction of 10 per cent., when and if bills were paid by the 10th day of each month following the month of rendition of service, as also the obligation to furnish meters gratis. Section 5 of this franchise ordinance reads as follows:

"This franchise is granted for a period of 20 years and is so granted and said franchise is accepted upon the express condition and understanding that the mayor and city council of the city of Stromsburg, shall have the option of securing a revision of the lighting rate schedule as set out in section 6 of this franchise at the end of the second, fifth, tenth, and fifteenth year of the existence of this franchise, by notifying Public Service Company, its successors or assigns of its intention within 30 days of the expiration of each period and said lighting rate schedule revision to be determined by a committee consisting of three persons, one to be named by the mayor, one by the grantee and two so chosen shall agree upon the selection of the third member of the committee. The committee when so appointed shall by majority prepare a schedule of lighting rates which shall allow the grantee a return, sufficient to cover all operating expenses, taxes, insurance, depreciation, and a fair return on its investment."

The company relies for reversal upon the contentions (a) that, while a state may confer upon a city the right to fix maximum rates to be charged by a public service corporation, the state of Nebraska has not done so, and therefore the city had no power to make a contract with the company fixing irrevocable rates, even for a term of 20 years; (b) that the power of the city under the applicable statute of Nebraska is a mere power of regulation; and (c) that even if the city had the power to contract, rather than the power to regulate, the contract made is void as to the company, because under the provisions of section 5 above quoted it is lacking in mutuality, and therefore as to the rate-making power void and unenforceable.

[1, 2] Casual reference may be made to a further contention of the company, which is that under section 16 of article 1 of the Nebraska Constitution, the Legislature of that state is forbidden to make "any irrevocable grant of special privileges," and therefore section 5019, Revised Statutes of Nebraska 1913, is constitutionally invalid,

if it be construed to confer upon a city of the second class the power to make an irrevocable contract for even a term of 20 years. This contention merits only a word. The Supreme Court of Nebraska, in the case of City of University Place v. Lincoln, etc., Co., 109 Neb. 370, 191 N. W. 432, held that section 16, supra, of the Nebraska Constitution does not forbid such a contract as is here in controversy. This court has ruled the point in consonance with the holding therein of the Nebraska Supreme Court. Omaha Water Co. v. Omaha, 147 F. 1, 77 C. C. A. 267, 12 L. R. A. (N. S.) 736, 8 Ann. Cas. 614. But, even if the latter ruling had never been made, we are bound by the construction which the Nebraska Supreme Court puts upon the Nebraska Constitution.

[3] The first contention in a way includes and clearly rules the second. Both sides are compelled to rely on section 5019, Revised Statutes of Nebraska 1913, which authorizes cities of the second class "to grant a franchise, subject to the conditions of this section, for a period not exceeding twenty-five years to any person, company or association, and to his or its assigns, to lay and maintain gas mains, pipes, service and all other necessary structures, or to erect and maintain poles, lines, wires and conductors for electricity in the streets, lanes, alleys and public places of the city, for the purpose of furnishing gas and electricity for lighting the streets, lanes, alleys and public places of said city, and for furnishing the same to the inhabitants thereof. Such franchise shall fix the amount that may be charged during such period for such gas or electricity, and provide that such city may after such period make any reasonable regulation with reference to any person, firm or corporation holding such franchise either as to charges for such gas or electricity or otherwise. They are further authorized to contract with any person, firm or corporation, furnishing either gas or electricity within such city, for the lighting of streets, lanes, alleys and public places of the city, but not for a period longer than five years; and to levy a tax for the purpose of paying the cost of such lighting of the streets, lanes, alleys and public places of such city."

The city construes the above section as granting power to it to pass the franchise ordinance in controversy and to fix therein by way of contract, the rates which may be charged to the inhabitants for electricity during the franchise term of 20 years. The company contends that the above section

does not confer authority upon the city to make a contract, but that it only confers the power of regulation. For this position the company largely relies on the case of City of University Place v. Lincoln, etc., Co., 109 Neb. 370, 191 N. W. 432. This case was decided by the Supreme Court of Nebraska, the decisions of which, when construing a statute of Nebraska, are, as above forecast, binding upon us in this case, and always within such limits at least as are set out in the case of Kuhn v. Coal Co., 215 U. S. loc. cit. 360, 30 S. Ct. 140, 54 L. Ed. 228. But the Supreme Court of Nebraska, in the University Place Case, was not construing section 5019, supra, but had under consideration section 1708, Comp. Stat. of Nebraska of 1909. This latter section, defining the powers of a city of the second class in the behalf under discussion, said that a city of the second class shall have power "to grant a franchise to and make a contract with any person, company, or association for the privilege of granting to such person, company or association the furnishing of light for the streets, lanes, alleys and other public places and property of said city and the inhabitants thereof, and to levy a tax for the purpose of paying the costs of such lighting the streets, lanes, alleys, and other public places and property of said city; and the furnishing of power to the residents, citizens and corporations doing business in such city."

The differences in language were brought about by amendments made to section 1708, supra, in 1911 (Laws 1911, c. 19). It is true the Supreme Court of Nebraska, in discussing, in the University Place Case, the question whether section 1708, supra, conferred the power to contract with, or simply the power to regulate, public utility companies, used this language: "At the time of the adoption of the ordinance hereinafter referred to, no power had been granted by the Legislature to cities of the second class to regulate the rates which a public utility corporation might lawfully charge for furnishing gas to the inhabitants of the city; such power was not granted until 1911. Rev. St. 1913, § 5019."

Obviously this language is obiter dictum and was merely used arguendo. The construction of section 5019, supra, which rules the instant case upon this point was neither before the court nor involved in the University Place Case, because the contract there in controversy was made in 1909, and while section 1708, supra, was in full force and effect. Moreover, section 5019, now under

construction herein, does conditionally provide for regulation; for it says that the contract authorized to be made shall provide for the making by the city of "any reasonable regulation" as to charges for electricity, after the termination of the period for which the franchise was granted.

It is urged, however, that by the amendment made in 1911 to section 1708, supra, the words "make a contract with" were stricken out, and do not appear in the statute as the latter read when the contract in the case at bar was entered into. From this fact it is argued by the company that the Legislature evinced a plain intention to take from cities of the second class the power to contract with a public utility corporation for a term of years and to fix in such contract the rates to be charged for electricity or gas. In view of the fact that by another amendment, made at the same time that the language last above was stricken out, these words were added, to wit: "Such franchise shall fix the amount that may be charged during such period for such gas or electricity, and provide that such city may after such period make any reasonable regulation with reference to any * * * corporation holding such franchise either as to charges for such gas or electricity or otherwise"—there would seem to be no consolation derivable from the mere omission of the words "to make a contract with." Rather, it would seem, the addition of the words "such franchise shall fix the amount to be charged during such period for gas or electricity" rendered it unnecessary to use the words "make a contract with" in the amended section.

Section 1708, supra, confers power upon a city of the second class to make a contract with any company to furnish light to the city and to the inhabitants thereof; yet it does not in terms, but only by implication, confer the power on the city to fix the rates to be charged for such light. Notwithstanding this omission of explicit authority to fix maximum rates, the Supreme Court of Nebraska, in the University Place Case, construed this section as authorizing the city to fix in such contract a maximum charge for such service. Explicitly, section 5019, supra, provides that in the franchise granted the city "shall fix the amount that may be charged during such period"—i. e., the term fixed for the franchise to run—"for * * * gas or electricity." After the expiration of the franchise period, the city has the power to make any reasonable regulation as to such charges for gas or electricity. The city is also, by a further provision of this section, given the power to make a contract for lighting its streets and public places, and of course to fix rates of charges for the service, but such latter contract shall not run longer than five years. This latter power to contract is not in issue here, but it casts some light by broad inference upon the existence vel non of the power which is in issue.

The Supreme Court of Nebraska, in our opinion, has not construed section 5019, supra, so far as concerns the point here in question. It is the duty and privilege of this court, then, to put its own construction upon this section, until the Supreme Court of Nebraska has pointedly spoken upon the point and even thereafter, so long as rights of parties who have contracted in reliance upon the construction put by this court on the statute are in issue and jeopardy. So, then, even if it be conceded that authority to make a contract of this sort must be conferred by clear and unmistakable language, we are constrained to conclude that the language used by the Legislature of Nebraska seems upon the point to fulfill this requirement, and we conclude that the city had the same right to make any contract upon the matter of fixing maximum rates for a term within the statutory limits of 25 years that any person sui juris and any other corporation would have had.

It is obvious that this view of the meaning of section 5019, supra, disposes of the second contention made by appellant; for, if the latter section confers the right to make a contract, the power of the city, under its provisions, is not that of mere regulation. It is, of course, clear from the language of this section that the power of regulation is likewise conferred. But, as already said, this power to regulate is not to be exercised as to rates to be charged for electricity to inhabitants of the city until the expiration of the 20-year term of the contract. Therefore this latter phase of regulation is not now involved in the case, because by its terms the contract has yet some 13 years to run.

[4] It is well settled that, where the public utility corporation and the city dealing with it have power to contract as to rates, and, so having power, fix by contract rates to govern during a specified term, the fact that such rates so fixed are or thereafter become confiscatory is not material to a court of equity, because in such case the right to enforce the rates agreed on is controlled by the obligation of the contract. Freeport

Water Co. v. Freeport, 180 U. S. 587, 21 S. Ct. 493, 45 L. Ed. 679; Detroit v. Detroit, etc., Ry. Co., 184 U. S. 368, 22 S. Ct. 410; 46 L. Ed. 592; Knoxville Water Co. v. Knoxville, 189 U. S. 434, 23 S. Ct. 531, 47 L. Ed. 887; Cleveland v. Cleveland, etc., Ry. Co., 194 U. S. 517, 24 S. Ct. 756, 48 L. Ed. 1102; Home Telephone Co. v. Los Angeles, 211 U. S. 265, 29 S. Ct. 50, 53 L. Ed. 176; Minneapolis v. Minneapolis, etc., Ry. Co., 215 U. S. 417, 30 S. Ct. 118, 54 L. Ed. 259; Columbus, etc., Co. v. Columbus, 249 U. S. 399, 39 S. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648; Southern Iowa El. Co. v. Chariton, 255 U. S. loc. cit. 542, 41 S. Ct. 400, 65 L. Ed. 764. This rule of law does not deal with the provisions of the contract. In fact, it assumes the existence of a contract which inherently is valid and binding, upon both the city and the public utility corporation. Southern, etc., Co. v. Chariton, supra. For, if the contract on which the rule rests is invalid, the premise fails, and, if the premise fails, inevitably the rule also fails.

[5] The remaining question is, therefore, a more serious one. If the city had the identical power to contract on behalf of the inhabitants for rates to be charged the latter for electricity, as any other corporation had, and we are constrained to conclude that it had this power, then the contract made by it is to be construed by the same rules of construction as is any other contract.

[6, 7] Section 6 of the ordinance passed by the city and accepted by the company—or by its predecessor, in whose shoes concededly it stands—provided maximum rates, as already said. More than these rates the company was for 20 years absolutely forbidden to charge or collect; for, as to the company, by the letter of the contract these rates were immutable. But section 5 of this ordinance, referring to the maximum rates set out in section 6, provided that the mayor and the city council of the city should have the right (called "option" in the ordinance, but "option" in such case means the right in him in whom it is vested of election or choice) of bringing about a revision of these maximum rates on the 3d days of April in the years 1919, 1922, 1927, or 1932, if they saw fit to do so. In short, these rates were binding upon the company, as the contract stands written, for the full term of 20 years; the city at most was bound for only 2 years. Two periods have passed already whereat, under the letter of the contract, the city could have moved for a revision, but no reciprocal right or option so to move was given to the company. The company is, by the language used, bound by the contract; the city is not so bound, except for such time as it may deem it to be to its interest or to the interests of its inhabitants to be so bound. Does this condition create such lack of mutuality as to render the contract void and unenforceable as to the provisions thereof fixing maximum rates? We are constrained to conclude that it does. For mutuality is lacking in a contract, when only one of the contracting parties is bound to perform and the rights of the parties exist at the option of one only. 13 C. J. 331.

[8] The contract is that sort of contract which the law requires to be bilateral; that is to say, it is one having no consideration, save mutual promises, to uphold it. 6 R. C. L. 676. In the last analysis, the company agreed to furnish electricity to the inhabitants of the city, and for that service the city agreed, for its inhabitants, that the company should be paid at certain maximum rates. These were the mutual promises upon this phase of the case. It may be suggested that the company got a franchise; i. e., the right to build its plant and use the streets, whereon to erect its poles and over which to string its wires, and that this was a consideration. The matter is one for the exercise, as to this suggestion, of ordinary common sense. The franchise was worth nothing to the company if it could not sell its product, and likewise, if it must sell at a loss, it was worth less than nothing. A thing which is known of all men to be valueless cannot ordinarily constitute a consideration, in a case where there are obvious considerations existing. It may well be that a franchise could be bought upon some such terms and consideration as would arise if the company had, in effect, said to the city: Give us a franchise for 20 years, and we will furnish you free light for your streets for a like period.

But that situation is not present here. The real consideration here consisted of the promises of the company to furnish service, and of the inhabitants to pay for that service. Of course, the contract could have provided that such payment should be a certain sum for the first two years, a lower sum for the next five, and a still lower sum for the next ten years, and thereafter nothing for the remainder of the term. Such a contract, when made by persons sui juris, or by corporations possessing full powers to contract, might have been valid. So, also,

under the view already-taken touching the contractual powers of the city, immutably fixed rates for the whole period could have been agreed on, and both parties would have been bound, both at law and in equity. Southern Iowa Electric Co. v. Chariton, 255 U. S. loc. cit. 542, 41 S. Ct. 400, 65 L. Ed. 764. But nothing of this sort was done. What was done was that the company under the letter of the contract was irrevocably bound to furnish service at a maximum rate, which it had no power to change or alter; while the city could, at its election, change or move to change this rate, within limits fixed by years, at its own volition. Either, then the contract, in order to be valid, ought to have fixed rates which would have been binding upon both parties for the whole term, or binding upon both parties for certain fixed portions of these terms, or both parties should have been given the right to move for a revision of rates at the termination of the periods stated. In either of these situations we think the contract might have been valid.

When sections 5 and 6 of the ordinance are read together and in the light of each other, it is seen to be a close question whether these sections in their sum do not amount to a retention by the city of the power to regulate rather than manifest an exercise of the power to contract. If they stood alone and without reference to the enabling statute (section 5019, supra), such construction would do no violence to either language or sense; and such a construction would make the problems presented so simple as to obviate all difficulty, for in that case all questions would be settled by the case of Southern Iowa Electric Co. v. Chariton, 255 U. S. 542, 41 S. Ct. 400, 65 L. Ed. 764. But, unfortunately for this view, the city can exercise no power except that conferred on it by the Legislature of Nebraska. State ex rel. v. Irey, 42 Neb. 186, 60 N. W. 601. This rule, is well-nigh universal in all jurisdictions. Section 5019, supra, does not grant the power to regulate, but the power to contract. So, it follows from what has been said already, that we are not able to resolve all difficulties by considering the ordinance as merely retaining the power in the city to regulate rates, even though the language used may fairly warrant such a view.

[9] It may be contended that the contract provided merely for a revision, and not necessarily for a revision downwards, and that, such being the case, it will be presumed that, if a revision upwards shall become necessary in order to save the company from bankruptcy and confiscation of its property, the right inhering in the mayor and city council will be promptly exercised. There exists, it is true, a convenient presumption of law to the substantial effect that officers who are saddled with a duty will perform that duty rightly. But "presumptions," as was said by Lamm, J., "are the bats of the law, and they fly away in the light of facts" evidencing a situation out of consonance with the presumption. Mockowik v. Railway, 196 Mo. loc. cit. 571, 94 S. W. 256. Here the city council took steps in March, 1920, to ascertain whether the rates fixed by the ordinance were confiscatory, and having ascertained, and solemnly announced, that the ordinance rates were insufficient, yet took no steps under the contract to revise these rates upward. Moreover, the presumption in fact does not apply here, because the mayor and the city council are not required to act; if they were, the contract might be good, and action might be compelled by the company.

[10] It may also be argued that this contract has been partly performed by the company; therefore it will be enforced, whether it lacks mutuality or not. There are cases which so hold; but it is apprehended that they bottom the ruling upon estoppel, which ought not to apply here, because, if for no other reason, the periods at which the mayor and city council may move to revise the rates are fixed at 2, 5, 10, and 15 years. Partial performance might well be excused upon the hope, notwithstanding the light of human experience, that the officers of the city would move for a revision if the rates should become confiscatory. Moreover, as forecast above, the city has not been misled to its hurt by the partial performance of the company. If, having a plant of its own, it had torn it down in reliance on part performance of a contract lacking mutuality, there might be estoppel.

We have found no case exactly on all fours, but, when the facts here are applied to well-known general rules, the conclusion seems inevitable that this contract is not mutual and binding alike upon both parties. Houston v. Telephone Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961; Laurens v. Northern, etc., Co. (C. C. A.) 282 F. 432; Central Power Co. v. City of Kearney (C. C. A.) 274 F. 253; City of Denver v. Stenger (C. C. A.) 277 F. 865. It follows that so much of the ordinance which purports to fix maximum rates for the franchise period of 20 years is void and unenforce-

able, and that the case should be reversed and remanded, with directions to the trial court to hear and determine the issues raised by the counterclaim, as to whether the rates sought to be fixed by section 6 of the ordinance are in fact confiscatory, and, if they are found so to be, to dismiss the bill of the city and enjoin the latter from enforcing such confiscatory rates.

An order may be entered accordingly, reversing and remanding the case, with directions.

SANBORN, Circuit Judge, concurs in result.

LEWIS, Circuit Judge (dissenting). I cannot see that there is a lack of mutuality in the obligations of the ordinance contract. The terms on which it was to be carried out are clearly stated and there are no conditions on which either is released from its execution. In consideration of the easement and franchise rights granted to it by the city, the gas and electric company agreed to furnish electric current to the inhabitants for 20 years at charges therefor not in excess of the rates named in the ordinance. As a further consideration it was agreed that the city might at stated times during the 20 years initiate arbitration proceedings as to rates, and the new rates, when so found, were to be thereafter charged, provided they were sufficient to yield a fair net return on the investment. The city has not asked for an arbitration. The gas and electric company complains that the maximum rates are not high enough now to yield a fair net return and it wants to charge more. But if it has contractually bound itself by accepting the grant not to charge more, its complaint is no more nor less than an effort to get out of a bad bargain by the assistance of the court. The city was given the right to initiate a change, but that change could not be made if it denied the gas and electric company a fair net return on its investment, and that is all that it could ever ask in the absence of contract for more. The gas and electric company charged the maximum rates and they were apparently sufficient for a while. The city has done nothing to render them unremunerative. That is due to changed conditions over which neither party had control and which were not anticipated and guarded against. If the gas and electric company is contractually bound to not charge in excess of the named rates, a right to it to initiate arbitration for a change of the named rates would be an idle and vain

thing. It could not charge more than the maximum, even with the assistance of arbitrators, if it has bound itself not to do so; and it was at all times free to charge less than the maximum, but it was not required to do so except after arbitration in the way specified in the ordinance and on condition that the rates so fixed by arbitration would yield a fair net return on the investment. As I understand the proposition on which reversal is rested, it is this: The contract cannot be enforced because it does not give the gas and electric company a right to initiate arbitration, like that given the city; that is, if one has the right to arbitrate downward from the named maximum the other must have the right to arbitrate upward, or there is no mutuality. That means, it seems to me, that the law will not permit the parties to do what they clearly intended to do, contractually fix maximum rates that could never be exceeded, and contractually provide a method of reducing those rates at stated periods, but not below what would yield a fair net return. I have no doubt that is just what the parties intended to do, and what they agreed to do; and I think they are mutually bound for sufficient considerations to each.