See also 134 F.Supp. 809.

KANSAS–NEBRASKA NATURAL GAS COMPANY, Inc., a Kansas Corporation, Plaintiff,
v.
The CITY OF ST. EDWARD, NEBRASKA, a Municipal Corporation, et al., Defendants.

KANSAS–NEBRASKA NATURAL GAS COMPANY, Inc., a Kansas Corporation, Plaintiff,
v.
The CENTRAL CITY, NEBRASKA, a Municipal Corporation, et al., Defendants.

KANSAS–NEBRASKA NATURAL GAS COMPANY, Inc., a Kansas Corporation, Plaintiff,
v.
The CITY OF ORD, NEBRASKA, a Municipal Corporation, et al., Defendants.

KANSAS–NEBRASKA NATURAL GAS COMPANY, Inc., a Kansas Corporation, Plaintiff,
v.
The CITY OF RAVENNA, NEBRASKA, a Municipal Corporation, et al., Defendants.

Civ. Nos. 88–54, Omaha Division, 521–523, Grand Island Division.

United States District Court
D. Nebraska.
April 20, 1955.

James D. Conway (Conway & Irons) and E. J. Jackson, Hastings, Neb., and Frank D. Williams (Cline, Williams, Wright & Johnson) Lincoln, Neb., for plaintiffs in all cases.

Earl Hasselbalch, St. Edward, Neb., for City of St. Edward.

Charles H. Phares (Raecke & Phares) and Donald F. Sampson, Central City, Neb., for Central City.

Edward L. Vogeltanz, Ord, Neb., for City of Ord.

Moller R. Johnson, Ravenna, Neb., for City of Ravenna.

DELEHANT, District Judge.

Instituted on the same day and with objectives materially differing only in location, these actions have proceeded together thus far and are so submitted for ruling on the present issue. In each case the defendants not identified by name in this caption are the mayor and council members of the designated city. In each, the same plaintiff, a Kansas corporation engaged in the production, gathering, transportation and marketing of natural gas, sues a different Nebraska city of the second class to whose inhabitants, under a franchise it serves such gas, and its designated officers, praying for an injunction against the defendants, forbidding them to prevent the plaintiff from putting into effect and collecting from customers in the city a schedule of rates differing from and in material respects higher than those rates prescribed in the franchise ordinance. Jurisdiction is based on manifest diversity of citizenship and, in the light of current costs of product and operation, the alleged repugnance of the franchise rate to the fourteenth amendment to the constitution of the United States. What is immediately demanded is a preliminary injunction pending the final hearing of each case.

Each complaint alleges the granting through an ordinance to the plaintiff by the affected city of a franchise for twenty-five years from its effective date for the installation of a natural gas service system within the city and the sale and service of natural gas to customers located in the city. The dates of the several ordinances are respectively as follows:

| Case Number | Date |
| --- | --- |
| 88–54, Omaha Division | October 2, 1950 |
| 521, Grand Island Division | February 11, 1946 |
| 522, Grand Island Division | April 4, 1949 |
| 523, Grand Island Division | May 2, 1949 |

Each such franchise was accepted by the plaintiff which entered upon its exercise and has continued therein. Each ordinance granting a franchise contained a section 4 dealing with rates. These differed slightly. For reference, all of them are set out in a footnote.[1] The section 4 of the franchise ordinance in

---

1. Rate provision in franchise in No. 88–54, Omaha Division:

"Section 4. Grantee shall file and make effective initially the schedule of maximum rates for natural gas service set forth below, and shall furnish natural gas at such rates, or at such other reasonable, lawful, and valid rates as may hereafter be established from time to time by Grantee, subject to the approval of the proper body having jurisdiction over such rates for gas service by grantee in said city.

Schedule of Rates:

| | | | |
| --- | --- | --- | --- |
| First | 500 cu. ft. per month | ...... | $ .20 Per C.C.F. |
| Next | 1,500 cu. ft. per month | ...... | .15 Per C.C.F. |
| Next | 1,000 cu. ft. per month | ...... | .10 Per C.C.F. |
| Next | 7,000 cu. ft. per month | ...... | .60 Per M.C.F. |
| Next | 90,000 cu. ft. per month | ...... | .50 Per M.C.F. |
| Next | 100,000 cu. ft. per month | ...... | .40 Per M.C.F. |
| Balance | .................................. | | .35 Per M.C.F. |
| Minimum Charge | ........................ | | $ 1.00 Per Month |

Gross Rate (above rate plus 10%) applied if bill is not paid within 10 days after date of bill."

Rate provision in franchise in No. 521, Grand Island Division:

"Section 4. Grantee shall file and make effective initially the schedule of maximum rates for gas service set forth below, and shall furnish gas at such rates, or at such other reasonable, lawful, and valid rates (not higher than the schedule of rates below) as may hereafter be established from time to time by Grantee, subject to the approval of the proper body having jurisdiction over such rates for gas service by Grantee in said city.

### Schedule of Maximum Rates:
Available to any customer using gas service.

| | | | |
|---|---|---|---|
| For the first | 500 cubic feet | or any part thereof, per month | $1.00 |
| For the next | 2,500 cubic feet | per month | $1.25 per 1,000 cubic feet |
| For the next | 7,000 cubic feet | per month | .60 per 1,000 cubic feet |
| For the next | 40,000 cubic feet | per month | .50 per 1,000 cubic feet |
| For the next | 50,000 cubic feet | per month | .42 per 1,000 cubic feet |
| For the next | 400,000 cubic feet | per month | .31 per 1,000 cubic feet |
| For the next | 500,000 cubic feet | per month | .28 per 1,000 cubic feet |
| All over | 1,000,000 cubic feet | per month | .25 per 1,000 cubic feet |

"Minimum monthly charge $1.00 per month, per meter; not subject to discount. Bills, except minimum bills, are subject to discount of 10% for payment within ten days and 5% for payment within twenty days."

Rate provision in franchise in No. 522, Grand Island Division:
"Section 4. Grantee shall file and make effective initially the schedule of maximum rates for natural gas service set forth below, and shall furnish natural gas at such rates, or at such other reasonable, lawful, and valid rates as may hereafter be established from time to time by Grantee, subject to the approval of the proper body having jurisdiction over such rates for gas service by Grantee in said city.

### Schedule of Rates:

| | | | |
|---|---|---|---|
| First | 500 cu. ft. per month | ...... | $ .20 Per C.C.F. |
| Next | 1,500 cu. ft. per month | ...... | .15 Per C.C.F. |
| Next | 1,000 cu. ft. per month | ...... | .10 Per C.C.F. |
| Next | 7,000 cu. ft. per month | ...... | .60 Per M.C.F. |
| Next | 90,000 cu. ft. per month | ...... | .50 Per M.C.F. |
| Next | 100,000 cu. ft. per month | ...... | .40 Per M.C.F. |
| Balance | ...... | | .35 Per M.C.F. |
| Minimum Charge | ...... | | $1.00 Per Month |

Gross Rate (above rate plus 10%) applied if bill is not paid within 10 days after date of bill."

Rate provision in franchise in No. 523, Grand Island Division:

"Section 4. Grantee shall file and make effective initially the schedule of maximum rates for natural gas service set forth below, and shall furnish natural gas at such rates, or at such other reasonable, lawful, and valid rates as may hereafter be established from time to time by Grantee, subject to the approval of the proper body having jurisdiction over such rates for gas service by Grantee in said city.

### Schedule of Rates:

| | | | |
|---|---|---|---|
| First | 500 cu. ft. per month | ...... | $ .20 Per C.C.F. |
| Next | 1,500 cu. ft. per month | ...... | .15 Per C.C.F. |
| Next | 1,000 cu. ft. per month | ...... | .10 Per C.C.F. |
| Next | 7,000 cu. ft. per month | ...... | .60 Per M.C.F. |
| Next | 90,000 cu. ft. per month | ...... | .50 Per M.C.F. |
| Next | 100,000 cu. ft. per month | ...... | .40 Per M.C.F. |
| Balance | ...... | | .35 Per M.C.F. |
| Minimum Charge | ...... | | $1.00 Per Month |

Gross Rate (above rate plus 10%) applied if bill is not paid within 10 days after date of bill."

No. 521, Grand Island Division, was amended after the grant of franchise by a further ordinance under date of October 13, 1947, effective October 25, 1947, which also the plaintiff accepted.

Each complaint then alleges that by January 1, 1954 the plaintiff's costs of commodity and operation had increased to such an extent that the ordinance rate schedule failed to provide for it a fair and reasonable return on its capital required in the service of gas to its customers; that thereafter the plaintiff submitted to the defendants a request for an increase in rates adequate to provide it with sufficient income to yield a fair and reasonable return on such capital in accordance with a requested rate schedule annexed to the complaint, a copy of the essential part of which is set out in a footnote;[2] that the defendants did not grant the request, but despite the plaintiff's renewed demand, failed, neglected and refused to approve the requested rate increase, whereby they confiscated the plaintiff's property and deprived the plaintiff of property without due process of law. It is also asserted that the requested rates are necessary to provide the plaintiff with a fair and reasonable return on its invested capital required for service to the customers in the city affected.

It thus clearly appears that the rate schedule for which the plaintiff contends is its own creation. It has never been in force within, or approved by, any of the defendant cities. What the plaintiff seeks in substance, therefore, is the striking down by injunctive order of the rate schedules imposed in the way of allowable maximum charges under the ordinances whereby it was granted its several franchises, and the substitution therefor of another, and in practical operation a higher, schedule which it has formulated and contends is now necessary, if it is to receive fair and reasonable compensation for its product.

A motion for preliminary injunction with supporting showing was served and filed in each case. Here an intolerable venture in pleading may be noted. The defendants in each case served and filed a motion to deny motion of plaintiff for temporary injunction. Such a pleading is of no real service. A motion to deny an antecedent motion already set for hearing accomplishes nothing that could not be done by a simple appearance in resistance to the earlier motion. Reasonable professional care is laudable. When it degenerates into illogical timidity it approaches the status of absurdity.

Upon the hearing on preliminary injunction the parties entered into a stipulation which the court allowed, of which a copy is reflected in a footnote.[3]

2. The proposed schedule in the several cases is identical. Omitting the identification of the city, the schedule in each instance follows:

"First 1,000 cubic feet 20¢ per hundred cubic feet*
Next 4,000 cubic feet 10¢ per hundred cubic feet
Next 45,000 cubic feet 6¢ per hundred cubic feet
Next 50,000 cubic feet 5½¢ per hundred cubic feet
All Additional 4½¢ per hundred cubic feet

*Minimum Monthly Charge: $2.00
Delayed Payment Charge: 5% on first
$20.00 of bill, plus 2% on excess.
Bills will be rendered at monthly intervals."

3. "Stipulation

"It is stipulated that the testimony of Leo E. Nelson and Lloyd Kline, would be as follows, and shall be considered as given for the purpose of the motion and application for preliminary injunctions and all questions as to foundation are waived:

"1. That the plaintiff is a Kansas corporation, fully qualified and domesticated to do business in the State of Nebraska.

"2. That the amount in controversy in each case exceeds the sum of $3000.00, exclusive of interest and costs.

"3. That the respective defendant municipal corporations are organized under and by virtue of the laws of the State of

In support of its motions for preliminary injunctions, the plaintiff has filed in the three cases pending in the Grand Island Division supporting showings, which, though filed after oral argument upon the motions, the court is to consider on the subject. Those showings sufficiently establish the plaintiff's efforts, during 1954 in the way of requests and supporting accounting showings, to induce each city through its mayor and council to grant the desired increase in rates and the failure of each city to grant the increase. Included in the showing is also a "Report on Nebraska Retail Gas Rates of Kansas-Nebraska Natural Gas Company, Inc. April, 1954", prepared by a nationally known accounting firm, copy of which was furnished to the mayor and council of each defendant city in the course of the negotiations for increased rates. That report tends to support the plaintiff's claim respecting its need for higher rates. It can hardly be said or found, however, that there has been any competent establishment of the data upon which it is expressly based. Somewhat similarly, averments, in the showings supporting the motions, of the necessity of increased rates if a fair return on capital is to be obtained are not the proof of facts but rather the declaration of the conclusions of an interested witness.

In the matter of the granting of the franchises and the enactment of the ordinances therefor and of the supplemental rate ordinance involved in No. 521, Grand Island Division, showings made by the several defendants and the essentially identical structure of the ordinances convincingly establish, and the court finds, that each franchise was actively solicited and each ordinance with its provision touching rates was prepared for enactment and submitted to the city by the plaintiff. Each such ordinance and its prescribed maximum rates were actively sponsored and initiated by the plaintiff. And no such ordinance is, or

Nebraska, as second-class cities; and that the individuals named as defendants in addition to the municipal corporations, are the respective Mayors and Councilmen of the four cities; that all of said individuals are residents of the State of Nebraska.

"4. That the plaintiff engages in the purchase, production, transmission, distribution and sale, both at wholesale and retail, of natural gas in the States of Kansas, Nebraska and Colorado, and distributes gas at retail in Central City, St. Edward, Ravenna and Ord, Nebraska; and that said natural gas is transported by pipeline to the customers in the four named cities, as well as other customers in the State of Nebraska, from the State of Kansas; that the facilities required for the transportation of natural gas from the State of Kansas to and including the town border stations of the four defendant cities and other customers in the State of Nebraska, are under the jurisdiction of the Federal Power Commission under the Natural Gas Act [15 U.S.C.A. § 717 et seq.], and said facilities require certification and certificate of authority as a prerequisite to the construction and maintenance thereof; that the Federal Power Commission has jurisdiction over rates chargeable by the plaintiff for natural gas sold in Nebraska

for resale; that in addition to the plaintiff's business of serving the customers of the four defendant cities, and other cities in Nebraska at retail, plaintiff engages in the sale of natural gas for resale to customers in the State of Nebraska.

"5. That the testimony of the above witnesses will support and substantiate the allegations of Paragraphs III, IV, V, VI, VII, VIII and X, all as set forth in the complaints of the plaintiff as against the four defendant cities, of Central City, St. Edward, Ord and Ravenna, Nebraska.

"6. That the defendants, and each of them, in agreeing to this stipulation, do so only for the purpose of expediting the hearing on the evidence of the plaintiff on its applications for preliminary injunctions, and for no other reason, fully reserving to them all rights of objection heretofore raised, or that may hereafter be raised.

"7. That if an order of preliminary injunction is entered by the Court, the same may be made effective up to and including any order on permanent injunction to be hereinafter entered by the Court; and that any surety to any bond and the conditions thereof, as required by the Court, is hereby waived by the defendants, and each of them."

contains, a rate prescription adopted upon its own motion or initiation by the city concerned and in the nature of a unilateral diminution of a theretofore prevailing rate. This is true even in No. 521, Grand Island Division, where an amended rate structure is relied on by the city, for, even there, the modified rate was agreed to and the plaintiff prepared the ordinance putting it into operation.

The court is persuaded that, in each instance, the requested preliminary injunction should be denied. Some considerations which lead to that conclusion may be mentioned.

The allowance or refusal of a preliminary injunction rests, upon the showing made, in the mature and informed discretion of the trial judge, and is not ordinarily a matter of absolute right. That discretion, however, is judicial in character, not personal to the judge, and may not at all be confused with a license for caprice or arbitrary action. It should be controlled by familiar equitable considerations and should be exercised with a view to the achievement of a just solution of the controversy, pending its orderly and final trial. Henry Gas Co. v. United States, 8 Cir., 191 F. 132; American Grain Separator Co. v. Twin City Separator Co., 8 Cir., 202 F. 202; Shubert v. Woodward, 8 Cir., 167 F. 47; Magruder v. Belle Fourche Valley Water Users Association, 8 Cir., 219 F. 72; Security Metal Products Co. v. Kawneer Co., 8 Cir., 14 F.2d 569; Benson Hotel Corp. v. Woods, 8 Cir., 168 F.2d 694; Missouri-Kansas-Texas Railroad Co. v. Randolph, 8 Cir., 182 F.2d 996; Great Western Railway Co. v. Chicago, Burlington & Quincy Railroad Co., 8 Cir., 193 F.2d 275; City of Des Moines v. Continental Illinois National Bank & Trust Co., 8 Cir., 205 F.2d 729; Volk v. Loew's Inc., D.C.Minn., 94 F.Supp. 162.

Considerations properly moving trial courts to grant a preliminary injunction were well summarized by Chief Judge Gardner in Benson Hotel Corp. v. Woods, supra, 168 F.2d at page 697, in this language:

"Such a temporary injunction should usually be granted where the questions presented are grave and injury to the moving party will result if it is denied and the final determination should be in his favor, while if it is granted and the decision is unfavorable the inconvenience and loss to the opposing party will be inconsiderable. Ordinarily, the court in its discretion may grant a preliminary injunction where it appears that there is a substantial controversy between the parties and that one of them is committing an act or threatening the immediate commission of an act that will cause irreparable injury or destroy the status quo of the controversy before a full hearing can be had on the merits of the case, and generally such an injunction will be granted whenever necessary to the orderly administration of justice."

Those circumstances, pressing for an affirmative answer to the question of the allowance of a preliminary injunction, are by contrast significant when one inquires what grounds argue for the denial of the temporary relief. If upon the balancing of probable losses and inconveniences the burden of an improvident choice seems calculated to fall the more heavily upon the defendant, if the likelihood of irreparable injury to the plaintiff is remote, improbable or negative, if the temporary injunctive order is sought not to preserve, but rather to terminate, the status quo, the finger of the scale may well be thought to point to a denial of the preliminary relief sought.

Somewhat instructive, too, though not controlling is the extent to which the moving party, by his showing, supports the probability of his eventual right to a permanent injunction. The preliminary injunction, indeed, has to do with the pretrial interval, not with the status after the decision of the trial court upon the merits, and it is to be al-

lowed or refused in measurable part according to the immediacy and urgency of the plaintiff's need of relief. But even thus early, the long range result is not wholly irrelevant. A preliminary injunction will be granted more readily when the claimant's right to permanent equitable relief is made to appear highly probable than when it is obscure and left in grave doubt.

■ It is merely mentioned in passing that, within the thought of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the law of Nebraska is controlling, except of course insofar as the court may finally be called upon to determine whether a taking of the property of the plaintiff in violation of the constitution of the United States has occurred or is threatened, and insofar as the jurisdiction or power of this court under applicable federal legislation may be involved.

The franchises under which the plaintiff is operating in the several defendant cities were granted, and the rates against which these actions are aimed were prescribed within the authority of Section 17–125 R.S.Neb.1943, Reissue of 1954. From it the following material excerpt is taken:

"A second-class city shall have power to grant a franchise, subject to the conditions of this section, for a period not exceeding twenty-five years to any person, company or association, whether publicly or privately owned, and to his or its assigns, to lay and maintain gas mains, pipes, service and all other necessary structures or to erect and maintain poles, lines, wires and conductors for electricity in the streets, lanes, alleys and public places of the city for the purpose of furnishing gas and electricity for lighting the streets, lanes, alleys and public places of said city and for furnishing the same to the inhabitants thereof. Such franchise shall fix the

amount that may be charged during such period for such gas or electricity and provide that such city may, after such period, make any reasonable regulation with reference to any person, firm or corporation holding such franchise either as to charges for such gas or electricity or otherwise."

It was held, prior to the amendment in 1911 of the foregoing statute into its present form, that the legislature of Nebraska had not given to cities of the second class the power to regulate rates for the service by a franchise holder of electric energy to the city's inhabitants, Wabaska Electric Co. v. City of Wymore, 60 Neb. 199, 82 N.W. 626. Later, in City of University Place v. Lincoln Gas & Electric Light Co., 109 Neb. 370, 191 N. W. 432, 433, which arose out of a franchise ordinance adopted in 1909, the court, though distinguishing the City of Wymore case, also held that in 1909 cities of the second class had no power to regulate rates for the service of gas to their inhabitants. In the City of University Place case, the opinion, by way of dictum said of the power so to regulate rates:

" * * * such power was not granted until 1911. Rev.St.1913, § 5019." [4]

The City of University Place case was decided in 1922. In 1924 on appeal from a judgment of this court, made and given by Judge Thomas C. Munger, the Court of Appeals decided Nebraska Gas & Electric Co. v. City of Stromsburg, 8 Cir., 2 F.2d 518. With no thought of attributing any particular significance to the reflected disparity of judicial thinking, it is observed that there is really no majority opinion as such in that case. Judge Faris, then a district judge, wrote the opinion announcing the ruling. Judge Lewis filed a dissenting opinion in which he protested principally against Judge Faris' view that in the ordinance in suit, considered as a contract, there

---

4. Essentially, and for the present purpose, Rev.St.1913, § 5019, is now Section 17–125 R.S.Neb.1943, Reissue of 1954.

was a fatal want of mutuality. Judge Sanborn concurred in the result arrived at by Judge Faris but apparently not in his opinion. The City of Stromsburg case involved a twenty year franchise for the service to the city's inhabitants of electricity granted by ordinance. The ordinance prescribed maximum rates under a schedule incorporated into it but reserved to the city alone the option to initiate at designated intervals during the term of the franchise, proceedings in the nature of arbitration for the revision of such rate schedule. By successive resolutions the city's council had first authorized in consideration of largely increased costs, and later withdrawn, a twenty-five per cent increase in the rates set out in the ordinance. And when the Gas & Electric Company refused upon the withdrawal to return to the ordinance erected rates, the city sought by injunctive action to compel such return. In his opinion, Judge Faris criticized as obiter dictum, and refused to follow, the language quoted from the opinion of the Supreme Court of Nebraska in the City of University Place case and later, 2 F.2d at page 523, expressly declared that Section 5019 R.S.Neb.1913, now Section 17–125 R.S.Neb.1943, Reissue of 1954, "does not grant the power to regulate" rates.[5]

But, except for the consequence of the Stromsburg ordinance's language reserving to the city a unilateral right to initiate periodical review of the maximum rates during the term of the franchise, the opinion of Judge Faris holds that the provisions of the grant of franchise including the maximum rate structure constituted a contract mutually binding upon the city and the Gas & Electric Company. And to that extent neither Judge Sanborn nor Judge Lewis appears to differ with him. That, too, is the essential decision of the Supreme Court of Nebraska in City of University Place v. Lincoln Gas & Electric Light Co., supra.

And much more recently, though not with regard to rates, the same court said of a natural gas franchise ordinance in Clough v. North Central Gas Co., 150 Neb. 418, 34 N.W.2d 862, 866:

"Ordinance No. 110 constitutes a contract between the city of Minatare and the defendant gas company. See City of University Place v. Lincoln Gas & Electric Light Co., 109 Neb. 370, 191 N.W. 432. The authorities are practically united that ordinarily a grant to a gas company of the right to supply gas and to use the streets is a franchise and, after its acceptance and performance, becomes a contract."

Attention may also be directed to Omaha Gas Co. v. City of Omaha, D.C.Neb., 249 F. 350, in which, however, the city charter involved was peculiar to Omaha and not that of cities of the second class.

The plaintiff's present adversaries advance the argument that each franchise in suit constitutes a mutual and binding contract between the granting municipality and the plaintiff, expressly allowable under the provisions of Section 17–125 R.S.Neb.1943, Reissue of 1954, and that, even though it be shown to have proved improvident for the plaintiff, injunctive relief may not be allowed to relieve the plaintiff from its burdens. That position is taken in reference both to the prayer for a permanent injunction and to the pending application for preliminary relief. Although the court is mindful of the authorities which deny to the prescription of maximum rates by franchise the effect of intercepting during the term of the franchise the regulatory power residing, subject to delegation, in the state, it does not consider that the argument of the defendants is manifestly without validity. Its final solution in these actions should abide their trial on the merits. But at this point it is of

---

5. Question may be allowed whether that challenge would now be in order in the face of Erie Railroad Co. v. Tompkins, supra. See Yoder v. Nu-Enamel Corporation, 8 Cir., 117 F.2d 488 under which even the dicta of the state's highest court are accorded an influence upon the rulings of federal courts not yet allowed to them in 1924.

sufficient significance to constitute a substantial consideration against the allowance of a preliminary injunction.

A second such consideration is the indecisive character of the economic showing made by the plaintiff in support of the instant demand. Some of it is in the nature of argument and conclusion reflected in ex parte material. The showing of the firm of accountants does tend to support the plaintiff's position, but it is untested in respect of many, if not most, of its factual assumptions and accounting procedures. Certain other features of the showing are regarded by the court as not instructive, among which may be mentioned the history of the acquiescence in the proposed higher rates by the other municipalities in Nebraska from which the plaintiff holds franchises. The defendants are probably unique in their obstinacy. But the chance remains that they may be right. Upon this subject it is merely said that the showing made in support of the allegation of irreparable injury does not persuade the court of its certainty and immediacy with the degree of assurance required for the injunctive enhancement by judicial mandate of the plaintiff's gas rates pending the trial of these cases.

■ Another at least tentative consideration. In Volk v. Loew's Inc., supra, the learned and widely experienced Judge Nordbye, in denying a preliminary injunction, adverted to the early triability on its merits of the case before him. This court is aware of several opinions rejecting that circumstance as a ground for the denial of temporary relief, and does not now rely upon it. However, it may not be amiss to testify to a large measure of sympathy with the view touched upon lightly by Judge Nordbye. Early triability unquestionably minimizes the degree, if it does not eliminate the actuality, of irreparable injury. Expense is reduced and finality is promoted in respect of appeal when the court proceeds promptly to a single final judgment as compared with its entry of successive equitable orders.

And it is a fairly familiar practice for a plaintiff, who has obtained a preliminary injunction according him pendente lite the relief he seeks, to lose much of his interest in the final trial of his case. So, early and final triability, though not a controlling factor, ought not to be disregarded altogether in a situation of this character.

But the issue between the parties most earnestly argued to the court has to do with the right or power of the United States District Courts to make and enter orders and judgments of the kind now sought. The defendants cite and rely upon Title 28 U.S.C.A. § 1342, in effect since May 14, 1934, See 48 Statutes at Large 775. The section follows:

"§ 1342. Rate orders of State Agencies

"The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

"(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

"(2) The order does not interfere with interstate commerce; and,

"(3) The order has been made after reasonable notice and hearing; and,

"(4) A plain, speedy and efficient remedy may be had in the courts of such State."

The "orders affecting rates chargeable by a public utility and made by * * * a rate-making body of a State political subdivision" to which the defendants severally point are their respective franchise rate provisions.

First encountered is the question whether, in the light of Section 17–125 R.S.Neb.1943, Reissue of 1954, and the reported opinions in Wabaska Electric Co. v. City of Wymore, supra, 82 N.W. 626; City of University Place v. Lincoln

Gas & Electric Light Co., supra, 191 N. W. 432; and Nebraska Gas & Electric Co. v. City of Stromsburg, supra, the city council of each of the several cities was "a rate-making body of a State political subdivision" and whether the rate provision of each franchise ordinance is an "order affecting rates chargeable by a public utility". Tentatively, and in the light of the history of these ordinances that question is being answered affirmatively. It is not considered that it has been presented with such adequacy as would warrant either a final answer to it or a tentative negative answer for the purpose of the pending applications for preliminary relief. In fact none of the parties seem now to urge upon the court a view different from that just expressed.

It seems obvious that condition (1) of Section 1342 is effective in these cases. While argument is made by the plaintiff that the rates prescribed in the ordinances in suit interfere with interstate commerce, the court is not convinced by it or the authorities advanced in its support, and thinks that condition (2) is also effective.

The court also has the present impression that for its protection the plaintiff has a plain, speedy and efficient remedy in the courts of Nebraska for any wrong to it by the defendants' action or inaction. The equitable jurisdiction of Nebraska's District Courts would seem to be adequate for that purpose. And condition (4) appears to be effective.

Counsel expend their chief efforts in maintaining opposite positions as to whether the order, that is, each franchise ordinance, was "made after reasonable notice and hearing" as contemplated in condition (3). The plaintiff takes the negative position upon that question, and contends that thereby the applicability to the instant case of Section 1342 is wholly obviated. It has to be acknowledged that the ultimate answer upon the point is not clearly indicated by the authorities.

Counsel for the plaintiff, relying largely upon Mississippi Power Co. v. City of Aberdeen, D.C.Miss., 11 F.Supp. 951, 952, insist that because Nebraska by its statutes does not provide for "reasonable notice and hearing" as a prerequisite to action regulating gas rates by the council of a city of the second class, it is immaterial whether any notice or hearing actually occurred preliminary to the enactment of any of these ordinances. Such "notice and hearing", so the argument runs, must be prescribed by general law and not left to the whim or indulgence of the city council. And the case last cited seems so to hold.[6] Somewhat

---

6. The plaintiff professes to find support for this position in certain Nebraska cases, Sheridan County v. Hand, 114 Neb. 813, 210 N.W. 273; McGavock v. City of Omaha, 40 Neb. 64, 58 N.W. 543; Albin v. Consolidated School District, 106 Neb. 719, 184 N.W. 141. They appear to this court not to be in point. All of them have to do with the prerequisite of notice, as a matter of due process, in the exercise of the right of Eminent Domain. The Hand and Albin cases reach the conclusion that statutes erecting procedures for the taking of private property for public purposes are void and inoperative which fail to provide for notice to the owner of the taken property of the time and place for the making of the assessment of just compensation for the taking. Less directly to the same effect is the McGavock opinion, whose reach seems also to have been limited in Enter-

prise Irrigation District v. Tri-State Land Co., 92 Neb. 121, 143, 138 N.W. 171, with a measure of acquiescence in the Albin case, supra, 106 Neb. at page 724, 184 N.W. 141. It may also be noted that in the Enterprise Irrigation District case, supra, 92 Neb. at page 143, 138 N.W. at page 179, the court says:

"On the point that the action of the board in adjudicating priorities does not constitute due process of law for the reason that the statute does not specifically provide for notice to the parties, we are of opinion that, where a statute under the police power of the state authorizes a proceeding affecting the property rights of any person and does not expressly provide for notice to be given, the right to notice is implied, and that, where a proper notice has been given under a procedure authorized by the Legislature and a party has appealed, he has

minimizing its persuasiveness is Mississippi Power & Light Co. v. City of Jackson, Mississippi, D.C.Miss., 9 F.Supp. 564, in which a judge of a different district in Mississippi considered that Section 1342 was applicable under the statutes of Mississippi and that what mattered was whether in actual practice the rate making body provided reasonable notice and hearing and met the minimum requirements of due process of law. United Gas Corporation v. City of Monroe, D.C.La., 46 F.Supp. 45, is hardly instructive upon the point. There a failure to provide any real notice or hearing was found, irrespective of the existence or absence of controlling state statute. The same may be observed of Georgia Continental Telephone Co. v. Georgia Public Service Commission, D.C.Ga., 8 F.Supp. 434. Counsel for the defendants cite East Ohio Gas Co. v. City of Cleveland, D.C.Ohio, 23 F.Supp. 965, affirmed, 6 Cir., 94 F.2d 443, certiorari denied 303 U.S. 657, 58 S.Ct. 761, 82 L.Ed. 1116. See also, though not in a rate controversy, Phipps v. School District of Pittsburgh, 3 Cir., 111 F.2d 393, affirming, D.C., 26 F.Supp. 811.

In an attack upon the maximum rate schedules of the franchise ordinances there may be serious question whether the plaintiff may be allowed to insist that the schedules were resolved upon and the ordinances adopted without "reasonable notice and hearing". These schedules are not embodied in rate reducing ordinances imposed upon the plaintiff without notice or against its will. They and the franchise ordinances are creatures of the plaintiff, formulated and prepared by it and through its negotiation obtained from the several city councils. Is the plaintiff now to be allowed to assert against them that their adoption occurred without reasonable notice and hearing? The court does not decide the question which has not yet been adequately discussed by counsel. It will have to be explored on final submission of the cases.

 As a limitation upon the jurisdiction of the District Courts, Section 1342 is not to be appraised too harshly. The circumstances and purpose of its enactment are not to be neglected. It was designed, as several of the cited opinions declare, to intercept a familiar abuse of the diversity jurisdiction of those courts. Much too frequently, foreign corporations, often organized as such with the diversity jurisdiction in view, had obtained franchises for the service to municipalities and their inhabitants, of gas, electricity, or water, and thereafter in dissatisfaction with the prescribed rates sought injunctive relief in the United States District Courts. The number and magnitude of such cases provoked hostility both to the corporate plaintiffs and to the courts, of which the cited legislation was an intelligible expression. It did not deny a deserving plaintiff the relief to which it was entitled, but it remitted such plaintiff primarily to the courts of the state in which it had elected, and not infrequently was especially organized elsewhere, to do business, and, only if those courts were without a plain, speedy and efficient remedy, allowed resort to the federal courts. The statute is not to be denied application upon the basis of some hostility to its curtailment of jurisdiction. The controlling question is whether it is aimed at these cases under its facts.

 Taking due account of all of the reported opinions in which the applicability of Section 1342 has been discussed, the court has to conclude that there is yet no consistent, and certainly no authoritative, determination whether it is applicable under facts indistinguishable from those of the present cases. The question is involved in such measure of

not been deprived of any of his rights without due process of law."
In that case the notice given conformed to standing rules of a state board to which the legislature had committed the prescription of a method of procedure.

The court does not consider that Nebraska decisions establish any local rule which governs here in the determination whether the requirement of Section 1342 for "reasonable notice and hearing" has been met.

uncertainty that it, too, should be determined not in a preliminary submission, but rather upon final trial on the merits.

In each of the Grand Island Division cases a motion to dismiss has been filed since the hearing on the applications for temporary injunctions. With some variations in form they all rest upon the contentions that the complaints severally fail to state a claim on which relief can be granted; that Section 1342, supra, gives rise in the circumstances of the cases to a want of jurisdiction over the subject matter of the actions; and in No. 522 that the same section causes a want of jurisdiction over the persons of the defendants. While the motions have not been formally set for argument, the arguments and briefs of counsel upon the plaintiff's applications for preliminary injunctions are also relevant to the defendants' motions to dismiss. And reasonable expedition in the management of a calendar suggests that ruling be now made on those motions.

The challenge in No. 522 to the court's jurisdiction over the persons of the defendants is wholly without merit. So, apart from the impact, if any, of Section 1342, is the challenge to jurisdiction over the subject matter.

And in respect of Section 1342, these records have not arrived at that point in finality where summary disposition of the actions upon motion is warranted. Cool v. International Shoe Co., 8 Cir., 142 F.2d 318; Leimer v. State Mutual Life Assurance Co., 8 Cir., 108 F.2d 302; Musteen v. Johnson, 8 Cir., 133 F.2d 106; Sparks v. England, 8 Cir., 113 F.2d 579; Publicity Building Realty Corp. v. Hannegan, 8 Cir., 139 F.2d 583; United States v. Arkansas Power & Light Co., 8 Cir., 165 F.2d 354. Certain of the considerations of tentativeness and uncertainty which have deterred the court from allowing the demanded preliminary injunctions also operate to defer until final trial the disposition of the issues raised by the motions to dismiss.

Orders denying those motions are, therefore, being made and given. And orders are also being entered denying the several applications for preliminary injunctions.

The original of this memorandum will be filed in No. 88–54, Omaha Division; and in each of the Grand Island Division cases the clerk will make appropriate filing of a notation or memorandum directing attention to No. 88–54, Omaha Division, for the contents hereof.