KANSAS–NEBRASKA NATURAL GAS COMPANY, Inc., a Kansas Corporation, Plaintiff,

v.

The CITY OF ST. EDWARD, Nebraska, a Municipal Corporation, et al., Defendants.

KANSAS–NEBRASKA NATURAL GAS COMPANY, Inc., a Kansas Corporation, Plaintiff,

v.

The CITY OF CENTRAL CITY, Nebraska, a Municipal Corporation, et al., Defendants.

KANSAS–NEBRASKA NATURAL GAS COMPANY, Inc., a Kansas Corporation, Plaintiff,

v.

The CITY OF ORD, Nebraska, a Municipal Corporation, et al., Defendants.

KANSAS–NEBRASKA NATURAL GAS COMPANY, Inc., a Kansas Corporation, Plaintiff,

v.

The CITY OF RAVENNA, Nebraska, a Municipal Corporation, et al., Defendants.

Formerly Civ. No. 88–54, Omaha Division, Formerly Civ. Nos. 521, 522, 523, Grand Island Division.

United States District Court
D. Nebraska.
Sept. 14, 1955.

James D. Conway (Conway & Irons), and E. J. Jackson, Hastings, Neb., and Frank D. Williams (Cline, Williams, Wright & Johnson), Lincoln, Neb., and Douglas Gleason, Ottawa, Kan., for plaintiff in all cases.

Earl Hasselbalch, St. Edward, Neb., for defendants in No. 88–54, Omaha Division.

Charles H. Phares (Raecke & Phares), and Donald F. Sampson (Sampson & Armatys), Central City, Neb., for defendants in No. 521, Grand Island Division.

Edward L. Vogeltanz, Ord, Neb., for defendants in No. 522, Grand Island Division.

Moller R. Johnson, Ravenna, Neb., for defendants in No. 523, Grand Island Division.

DELEHANT, District Judge.

On April 21, 1955 the court filed in No. 88–54, Omaha Division, a memorandum opinion [1] equally applicable to all of these actions explanatory of its ruling under date of April 20, 1955, denying the plaintiff's several applications or motions for preliminary injunctions. Since that filing the several actions have come to issue and they have been finally submitted to the court in a consolidated trial upon the prayers of the separate complaints for permanent injunctions. This memorandum is prepared to announce and explain the final ruling of the court upon the merits of each action.

Since this announcement is principally, if not altogether, designed for the advice of counsel, it is believed that it may profitably be abbreviated by reference to, and the adoption of, certain portions of the earlier memorandum, without the necessity of their verbal restatement.

Thus, the general nature of each case on trial, the granting and dates of the several franchises involved, the franchise rate provisions, including the later amendment of the rate section of the franchise in No. 521 Grand Island, and the broad ground asserted in each case for injunctive relief, as those matters are set out in the respective complaints, are sufficiently referred to in that memorandum and will not now be repeated. It may be noted, however, that the amended and currently effective rate structure fixed by the amendatory ordinance in No. 521, Grand Island, is as follows:

"
Schedule of Rates

| | | |
|---|---|---|
| For the first | 500 cu. ft. or less | $.90 |
| For the next | 1,500 cu. ft. Per Month | .90 Per MCF |
| For the next | 3,000 cu. ft. Per Month | .70 Per MCF |
| For the next | 5,000 cu. ft. Per Month | .55 Per MCF |
| For the next | 40,000 cu. ft. Per Month | .45 Per MCF |
| For the next | 50,000 cu. ft. Per Month | .38 Per MCF |
| For the next | 100,000 cu. ft. Per Month | .34 Per MCF |
| All over | 200,000 cu. ft. Per Month | .30 Per MCF |

Minimum monthly charge $.90 per month per meter; not subject to discount."

1. Bearing date April 20, 1955, —— F.Supp. ——.

That schedule is not set out in the earlier announcement of ruling.

In each case by amendment to the complaint the plaintiff alleges that its acceptance of the franchise involved (including the amendatory rate ordinance in No. 521, Grand Island) was made by a formal written instrument and sets out a copy of such instrument. Then, too, each amendment amplifies the assertion in the complaint of plaintiff's request for an increase in rates whose denial led to the suit. It alleges that the request was first made orally to the defendants in the particular case, and shortly thereafter was renewed and summarized in a written report thought to justify the increase of which a copy accompanies the amendment, and that the "plaintiff suggested said rate increase be accomplished by the enactment of a new franchise ordinance to be supplemented by a separate rate ordinance establishing the increased rates", of each of which suggested ordinances a copy accompanies the amendment. The amendment also amplifies the complaint's averment of a reiterated request for increase by alleging that plaintiff then "suggested said increased rates be put into effect either by the enactment of a new franchise ordinance and supplemental rate ordinance", being the proposed ordinances just mentioned, "or by enacting an ordinance amending the existing franchise ordinance. * * * to make said increased rates effective" of which alternatively proposed ordinance a copy is also attached to the amendment.

Those several proposed ordinances, none of which were adopted will be discussed later herein, for an issue is made touching each of them.

Each answer [2] admits plaintiff's incorporation; the corporate character of the affected municipality; the official qualification of the individual defendants; the nature of the business and qualification and operation in Nebraska of plaintiff; the details of the plaintiff's requested rate schedule; the granting and effectiveness of the franchise to plaintiff alleged in the complaint and the rate provisions under which plaintiff is rendering service; the defendants' failure, neglect and refusal to act on the proposed rates and employment, along with other municipalities, of a competent engineering firm to examine plaintiff's records for the purpose of determining the propriety of the requested new rate for the provision of a fair and reasonable return on plaintiff's invested capital required for the service of gas customers in the defendant city; the making, as of September 27, 1954, by such engineering firm of a report supporting and corroborating plaintiff's need for the establishment of the rates requested by it in order to provide for it a fair and reasonable return on invested capital (although it elsewhere appears that defendants actually do not intend to admit that the report supports such need); the engagement by plaintiff (in addition to its distribution at retail of gas within the affected city) in the production, purchase and acquisition of natural gas in Kansas and other states, and the transportation of such gas by pipeline to its customers in Nebraska, including those in the answering city; the jurisdiction of Federal Power Commission over the facilities required for the transportation of natural gas to the town border station of the affected city; the legal necessity under the Natural Gas Act, 15 U. S.C.A. § 717 et seq., of certification and authority as a prerequisite to the construction of such facilities; the Commission's jurisdiction over rates chargeable by plaintiff for natural gas sold in Nebraska for resale; and plaintiff's engagement in the sale to other customers in Nebraska of natural gas for resale to consumers.

Each answer denies the complaint's allegations of the failure of the rates erected by the existing franchise ordinance involved [3] to give plaintiff a fair and reasonable return on its invested

2. All defendants in each case join in answering.

3. With the amendment thereof pleaded in No. 521, Grand Island.

capital required for the service of gas customers in the answering city; action by the answering defendants in a confiscatory manner and their deprivation of the plaintiff of its property without due process of law; the necessity of the demanded rates if plaintiff is to be provided with a fair and reasonable return on its invested capital; plaintiff's lack of an adequate remedy at law; plaintiff's subjection to irreparable injury if the demanded rates be not allowed; the validity of plaintiff's prayer for injunctive relief as prayed; plaintiff's successive demands for an increase in rates to provide it with sufficient revenue to earn a fair and reasonable rate on its invested capital, and their own failure, neglect and refusal so to do.[4]

It should be understood that the several admissions and denials reflected in the last two paragraphs are directly responsive to allegations upon the same subjects made by plaintiff in each of its complaints as amended.

Each answer affirmatively alleges that the ordinance or ordinances already in effect in the answering city respecting plaintiff's franchise and natural gas rates, was, or were as the case may be, proposed, prepared and submitted by plaintiff on its own initiative and enacted in the manner required by law at the request and in the presence of representatives of plaintiff; that each such franchise and rate ordinance, upon its enactment was by the plaintiff formally

accepted in writing; that plaintiff's present request for an increase in natural gas rates was not a simple request for such an increase, but was rather accompanied by a request that such increase be granted through the enactment of an ordinance or ordinances[5], which "included substantial changes and modifications, other than changes in rates, in the terms of the existing franchise" of plaintiff; that plaintiff has never either orally or in writing requested defendants to increase its natural gas rates without coupling such request with, or conditioning it on, other substantial changes and modifications in the existing franchise provisions; that defendants refused to enact the requested ordinances so increasing rates and changing the franchise or either or any of them[6]; that the legislature of Nebraska has delegated the exclusive power to establish natural gas rates, for the furnishing of natural gas to municipalities and their inhabitants, to such municipalities; that the existing franchise of plaintiff for the affected city, including the existing rate provisions, constitutes a binding contract between plaintiff and the city whose validity plaintiff is estopped to deny; that plaintiff as an inducement for the passage and adoption of the ordinance erecting the existing rate structure represented to the city that plaintiff could not increase its rates above those specified in the ordinance without the consent and approval of the council of defendant city[7], and on that

4. This denial does not go to the length of asserting that no such demands were made or that, when made, they were, in any way complied with. On the contrary, the affirmatively pleaded portions of the several answers recognize the making of the demands for increased rates and the defendants' noncompliance with them, but endeavor to explain the justification of the course of the respective municipalities.

5. Actually, the proposal of plaintiff suggested the use of either of two methods, each by supplemental ordinance or ordinances.

6. The averments touching the coupling, with the request for rate increase, of a

request that it be effected by the enactment of an ordinance or ordinances which would have materially changed the existing franchise, otherwise than in respect of rates, and the refusal of the city to enact any such ordinance seem not to be expressly made in the answer in No. 88-54 Omaha. But the issue is undoubtedly presented by the disclosure of the ordinance or ordinances by which plaintiff proposed to have the desired rate increase carried into effect and the obvious fact that no such ordinance was adopted.

7. This factual allegation seems to be unsupported by proof. And even if it were established, it would have to do only with a representation touching a legal con-

account also is estopped to claim the right to an increase without the consent and approval of tthe council of such city.

Each of the answers also contains an averment that this court is without jurisdiction over the subject matter of the action. And some of them explicitly contend that the complaints to which they respectively respond fail to state claims on which relief can be granted.

Though replies were unnecessary, plaintiff served and filed a reply in each case. Each such reply admitted the plaintiff's preparation and submission of the current ordinance, (or ordinances in No. 521, Grand Island) and the enactment of the same in the presence of representatives of plaintiff; and in No. 521, Grand Island, the reply admitted the ownership by the affected city of its own gas and distribution plant prior to the granting of plaintiff's franchise and negotiations and agreement for the purchase by plaintiff of such plant; its own written acceptance of the franchise ordinances and its subsequent operation thereunder. Plaintiff also admits that it never requested any defendant city to increase rates in any form other than that set forth in the proposed ordinances, copies of which form a part of the pleadings, and admits the city's refusal to adopt either of the proposed rate increasing ordinances. Otherwise, the reply denies the affirmative averments of the answer in each case.

Upon the trial the evidence was almost entirely presented by plaintiff. Indeed, apart from certain financial reports of plaintiff to its stockholders, the evidence submitted by the defendants is without significance. From the pleadings, insofar as they are in agreement, and the evidence, the following facts are found.

Plaintiff is and at all times presently material has been a corporation organized in, and under the laws of, Kansas and authorized to transact business in Nebraska. It is, and at such times has been, engaged in the purchase, production, transmission, distribution and sale, both at wholesale and at retail, of natural gas within the states of Kansas, Colorado and Nebraska.

Its principal supply of natural gas is obtained from the Hugoton Natural Gas field located largely in southwestern Kansas, but extending into Oklahoma and Texas. It also secures some, though a comparatively small portion, of its gas in northeastern Colorado and southwestern Nebraska. It both produces natural gas and acquires it by purchase.

The plaintiff owns and operates a coordinated natural gas gathering, transmission, and distribution system whereby natural gas produced or purchased by it is transmitted from the point of its acquisition, through pipe lines constituting essential elements of the system, to the points of its final disposition and sale. This system extends from its natural gas sources in Kansas northerly into Nebraska and is connected with like elements of it originating at acquisition points in Colorado and Nebraska, with the consequence that natural gas from the three states is commingled for transmission to, and sale within, any of them; and from all of such states plaintiff collects, transmits and distributes natural gas for sale both at wholesale and at retail within the state of Nebraska.

A relatively small portion of the natural gas acquired by plaintiff from special points in Kansas is entirely marketed and distributed in an area within Kansas near to its acquisition and never reaches the interstate system. This is correspondingly true of a very small quantity of gas acquired and marketed in the area of its acquisition within the state of Colorado. But those strictly intrastate operations represent a small, almost trivial, portion of plaintiff's business. For the greater part it sells the gas produced or purchased by it within the three states mentioned, ei-

clusion, not with a statement of a material fact and could not serve to alter or im-

peach the franchise ordinance in question.

ther to wholesale customers (often municipalities) for resale, or to large individual consumers for consumptive use, or at retail to municipalities or their inhabitants or to both for use by such purchasers.

As of the time of trial, the plaintiff furnished natural gas service to 205 communities, of which 10 were wholesale customers and 38 retail outlets in the state of Kansas; 8 were communities served at retail in the state of Colorado; and 53 were communities served at wholesale and 96 at retail in the state of Nebraska.[8]

Each of the defendant municipalities is and at all material times has been a city of the second class under the laws of the state of Nebraska and located within such state, and the individual defendants associated as parties defendant with each such city at the time of the institution of the suits, were its mayor and councilmen. In each of the four cities which are defendants, plaintiff is and for a considerable period of time has been engaged in the sale and delivery to the municipality in question and to its inhabitants of natural gas acquired, transmitted, and distributed through the use of its interstate facilities already mentioned. Without present particularization, for there is no issue upon the point and the pleadings agree concerning it, each city, as of the date indicated in the pleadings and in the earlier memorandum of this court, by ordinance granted to plaintiff the franchise for the construction and laying down within the city of a natural gas distribution system and the sale to inhabitants of the city and to the city itself of natural gas, which ordinance contained a section prescribing maximum rates for the term of the franchise designated as Section 4, copy of which is incorporated into the memorandum already mentioned. In addition, the city of Central City, as has already been disclosed and as appears from the pleadings

in No. 521 Grand Island, shortly after the grant of franchise enacted a further ordinance modifying the rate provisions of the original franchise ordinance.

All of the franchise ordinances and the amendatory rate ordinance in No. 521 Grand Island, were initiated, invited and actively solicited by the plaintiff itself which prepared every such ordinance and presented it to the council of the affected city and superintended its enactment, which actually occurred in the presence of a representative or representatives of plaintiff. In no instance was any ordinance involved in these proceedings now in effect initiated by or at the instance of the municipality concerned, or otherwise than at the behest of plaintiff.

Moreover, upon its passage each franchise ordinance and the franchise therein granted were expressly accepted without condition or reservation, in writing duly delivered to the municipality by plaintiff, and plaintiff in like manner accepted and approved in writing the amendatory rate ordinance involved in No. 521 Grand Island.

Allowing for the varying intervals required for the construction of local distribution facilities in the respective cities, plaintiff is and continuously since the grant of each franchise, has been engaged under such franchise in the sale and delivery to the municipality granting the franchise and to its inhabitants of natural gas upon a retail sale basis.

From time to time subsequent to the granting of the franchises to it by the several defendant municipalities, and in substantial measure through the year 1953 and early in 1954, plaintiff necessarily incurred and was compelled to pay largely increased costs for its purchased natural gas, and for its production of natural gas, for its supplies and materials, for salaries and wages, and generally for nearly all items of expense in the management and operation of its

---

8. The ninety-six Nebraska retail points are, of course, more than the eighty-two municipalities in the state within which

rate increases were sought in 1954, upon rejection of the requests for which in four cities these cases were instituted.

business. In consequence, the expenses of its operation and the acquisition and marketing of its product largely increased and its net income, premising an unchanged sale price for the product, was correspondingly reduced.

In an effort substantially to improve its earning position, plaintiff in 1954, through its authorized representatives, orally requested all of the cities in Nebraska within which it then sold natural gas at retail to grant it the right to increase the price of natural gas sold within such municipalities to the inhabitants thereof. To each municipality within the groups or classifications in which all of the defendant cities are included, it proposed the same new rate which is reflected in Footnote 2 attached to the memorandum of April 21, 1955. Like request was made of each of the four cities which are defendants in these cases. It fairly appears from the record before the court that all others of the Nebraska cities approached, then 78 in number, acceded to the request. But each of the four defendant cities denied and refused it and persisted in such denial and refusal despite the subsequent renewal of the request by plaintiff.[9]

The request of plaintiff for an increase in natural gas rates over its franchise prescribed rates in the several defendant cities was not a simple request for an increase in a specified percentage above the then prevailing rate without more. On the contrary, as a part of the requests orally made, plaintiff suggested and requested that the desired increase be effected through the passage of ordinances in either of two patterns:

I—First, and apparently preferably, through a completely amendatory franchise ordinance with a concurrent, but separate and supplemental, rate ordinance which in combination had as features differing from the then existing franchise ordinance these provisions:

1. The proposed amendatory franchise ordinance did not within itself fix rates, but left that matter to provision by the concurrent special rate ordinance, a probably immaterial departure (see, however, Section 17–125, R.S.Neb.1943, Reissue of 1954, infra);

2. By its terms, the amendatory ordinance granted a franchise of twenty-five years from and after its passage and thus extended by that measure the life of the existing franchise;

3. By its Section 3 it introduced as a new ground of excuse from the plaintiff's obligation to make extensions of service the following—"if grantee shall for any reason be unable to obtain an adequate supply of gas to warrant the construction of said extension";

4. It newly introduced into the franchise a provision for the annual payment by plaintiff to the municipality of an amount equal to 2% of its receipts, with a further provision allowing credit thereon to the extent of any franchise tax which the municipality might thereafter enact in application to plaintiff.

II—Secondly, and alternatively, through the enactment of a single ordinance not completely revising the then existing franchise ordinance, but amending the rate provisions, accompanied, however, by the erection of the 2% annual payment based on receipts just referred to.

It will be observed also that the proposed increased rate structure does not contemplate a percentage increase equally applicable to all gas sold by the plaintiff within the municipality, irrespective of the monthly volume, but rather devises an entirely new system of volume brackets and increases the minimum monthly billing from $1.00 to $2.00.

9. The rejection, separately accomplished by the several cities, is admitted in each case.

It fairly appears from the pleadings, and is found to be true, that plaintiff proposed the former of those alternative procedural methods as a feature of its initial oral request for the presently sought rate increase and advanced the latter of the methods in its later or "follow-up" demand.

Each of the defendant cities, by its council, considered, but did not approve the request of plaintiff so made. None of such cities adopted either of the alternatively requested ordinances. And none of them, by ordinance, resolution or otherwise granted the request for increased natural gas rates.

Plaintiff, by its evidence upon the trial adequately proved that at the time of demanding the increase in natural gas rates the rates then and still in effect in the four defendant cities were inadequate to provide it with a fair and reasonable return on its invested capital used and required for the service of natural gas to the communities involved. In all the circumstances a fair and reasonable return on such invested capital would be between six per cent and six and one-half per cent per annum. Those figures give due consideration to plaintiff's established cost of capital, to generally prevailing returns on money invested in business, and to the possibility of the stable attraction of capital towards investment in the plaintiff. Omaha & Council Bluffs Street Railway Co. v. Nebraska State Railway Commission, 103 Neb. 695, 173 N.W. 690.

It is satisfactorily proved that, in late 1953 and through 1954, plaintiff was earning substantially less than that fair return upon its invested capital in the operation of its entire system. And that was shown to be even more sharply true in respect of its Nebraska retail operations. Its invested capital for such Nebraska operations is shown to have been $12,634,256 as of December 31, 1954. That valuation, it may be observed, was arrived at upon the basis of original cost less depreciation which, it was clearly shown, was lower than replacement cost.

Plaintiff's actual net return from its Nebraska retail operations in natural gas during 1954 was in the sum of $544,276 which amounted to 4.31% of the foregoing investment. That return included revenue from increased rates in 78 of the cities for varying portions of the year, following their allowance of the requested increase in rates, supra. If that increased return were deducted from the revenue actually received and the necessary accounting adjustments were made, the percentage of earning for 1954 would have been 4.08, even on the cost basis for 1954. And, with appropriate adjustment for known and measurable changes in income and costs, that figure would have been reduced to 3.91%.

To provide a return of six per cent for 1954 upon plaintiff's actual net invested capital used and required in its Nebraska natural gas retail operations, $512,945 in additional receipts would have been required. Upon the basis of experienced demand, the additional receipts from the requested increase in rates in the eighty-two cities are computed on an annual basis to be $488,280 of which $447,498 should come from the seventy-eight cities and towns in which the increase was granted and $40,782 from the four defendant cities.

It is, therefore, manifest that even with the requested increase in rates plaintiff's return on invested capital would remain somewhat below six per cent.

In their arguments, oral and written, counsel for the several parties deal with the following questions which are probably stated in sharpest detail (although not in the order or sequence immediately hereinafter reflected) in the briefs submitted by defendants in No. 88–54 Omaha and No. 521 Grand Island and by plaintiff:

"1. Has plaintiff produced evidence to sustain its claim of the necessity of the rate increase demanded, in order to provide it with a fair and reasonable return on its invested capital used and required for the

service of the natural gas customers in the defendant cities?[10]

"2. Has plaintiff made upon the several defendant cities any simple demand for an increase in natural gas rates which the cities are required to grant?

"3. Is plaintiff by its earlier conduct estopped to advance its present contention of the deprivation of its property without due process of law?

"4. Do the several franchise ordinances, with their rate prescriptions, and plaintiff's acceptance thereof constitute valid and binding contracts for the duration of each franchise, touching rates, against which plaintiff may not have the relief it seeks?

"5. Does this court, in view of the so-called 'Johnson Act', Title 28 U.S.C. § 1342, have jurisdiction over the actions and the power to grant the relief prayed for by plaintiff?"

These questions should be individually answered.

From the statement of facts already made, it will be apparent that the court considers plaintiff to have supported adequately its contention that, in order that it may earn a fair and reasonable return on its invested capital used and required for the service of natural gas customers in the defendant cities, it is necessary that it be granted an increase in rates for natural gas sufficient to yield added income at least in the amount which the requested higher rate would produce. That factual question is not the subject of any dispute in the testimony and evidence. The defendants suffered plaintiff to make its record upon the point over objection and now merely contend that it is insufficient. The court is unable to agree.

It has to be granted that the showing of plaintiff is less emphatic than is often made in such cases. But, undisputed in its basic facts, it is sufficient to support the conclusion that the existing franchise rates in the four cities produce substantially less in the way of income than is required to provide a return of six per cent per annum on plaintiff's demonstrated invested capital. And a lower return in the circumstances of its business is not enough to be fair or reasonable, and is, therefore, confiscatory.

The court is quite aware that the proposed increased rate schedule does not provide for the addition of a flat percentage of the existing rates applicable alike to all quantitative brackets of every customer's consumption. On the contrary, it erects brackets for quantities of the monthly consumption of each retail customer somewhat different from those set up in the current ordinances. For want of evidence upon the subject, the court has made no finding touching the practical necessity or propriety of the reconstitution of the brackets or the justification of the rates assigned to the several brackets. But that problem is not argued in the briefs. And, more significantly, it evoked no evidentiary dispute. The justification of the quantitative bracketing and pricing is not presented as an issue. The justification of the increase sought in revenue is satisfactorily made to appear. If the defendants were satisfied with the overall return demanded but objected to its allocation, they should have made their position clear. The court merely rules upon this issue after the manner of its trial.

Notice is taken also that plaintiff made its proofs upon the basis of zones of operations and treated the four cities involved, along with others, as a single zone for rate making with a common rate. It did not separately evaluate its invested capital in the distribution facilities located in each of the cities (with allocation of property used in common by all of them) and set up a separate

10. Putting aside for the present the legal obstacles to relief proposed by defend-ants, even if plaintiff be found to have sustained its economic claim.

rate for each city. Its course in that behalf, though now challenged by defendants, was justified. The evidence to to the court's satisfaction establishes the essential identity of rate making ingredients in the several cities of the zone and that the method pursued results to the advantage of the retail customers within the defendant cities.

The second position of defendants has more substance. It seems very clear that plaintiff's demands upon the several municipalities have not been for a simple increase in natural gas rates and no more, but have consistently been associated with requests that the grant of the increase be effected by one or more ordinances inevitably altering provisions of the existing franchises beyond those having to do with rates. The changes sought have already been mentioned and will not be repeated.

This intrusion of demands other than for mere rate changes does not control the court's ruling.[11] It is regarded as something that might be eliminated by proper provisions in an injunctive order. But it is mentioned in passing as a complication which plaintiff itself has unnecessarily and embarrassingly introduced into what, without it, might have been a very simple demand.

The court understands the defendants' third position, dealing with estoppel, to rest principally upon their fourth point, under which they insist that the rate provision of each franchise ordinance, once accepted and acted upon, became and is a contract by which plaintiff is bound for the duration of the franchise. That point is, therefore, approached.

It finds substantial support in the law of Nebraska, which governs here. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Each franchise was granted, and the rates set out in it were prescribed in accordance with Section 17–125, R.S.Neb.1943, Reissue of 1954. That section [12] provides in part:

"A second-class city shall have power to grant a franchise, subject to the conditions of this section, for a period not exceeding twenty-five years to any person, company or association, whether publicly or privately owned, and to his or its assigns, to lay and maintain gas mains, pipes, service and all other necessary structures or to erect and maintain poles, lines, wires and conductors for electricity in the streets, lanes, alleys and public places of the city for the purpose of furnishing gas and electricity for lighting the streets, lanes, alleys and public places of said city and for furnishing the same to the inhabitants thereof. Such franchise shall fix the amount that may be charged during such period for such gas or electricity and provide that such city may, after such period, make any reasonable regulation with reference to any person, firm or corporation holding such franchise either as to charges for such gas or electricity or otherwise."

The second quoted sentence goes a long way in the direction of making mandatory what, the defendants contend, was actually done in the enactment of the existing ordinances, namely, the erecting of a contract respecting "the amount that may be charged * * * for such gas" during the term of the franchise. And controlling authority, which this court is not at liberty to disregard, has lent support to that conclusion.

In 1900, the Supreme Court of Nebraska, in Wabaska Electric Co. v. City of Wymore, 60 Neb. 199, 82 N.W. 626, held that the legislature of Nebraska had not theretofore granted to cities of the second class the power to regulate the rates to be charged to its inhabitants by

---

11. Actually, it is not very pointedly or lucidly argued in the briefs. The point is made but it is not convincingly particularized or discussed by defendants.

12. For present purposes the quoted section may be considered to have come into the statutes through amendment by the legislature in 1911 and to be indistinguishable from Section 5019, R.S.Neb.1913.

a franchise holder for electric energy sold to the inhabitants. And that court affirmed dismissal of an action for an injunction forbidding the city itself rather than its mayor and council to adopt and enforce an ordinance fixing rates. The court reasoned that the threatened enactment of the ordinance would be an unauthorized and void act of the city's governing body for which action would lie not against the city, but if at all against the officers. In City of University Place v. Lincoln Gas & Electric Light Co., 109 Neb. 370, 191 N.W. 432, 433, the same court in 1922 had under consideration a gas franchise ordinance of a city of the second class approved in 1909, therefore before the amendment of 1911. The franchise, like the ones now in suit, had been solicited by its grantees and contained a clause fixing a maximum price for gas to be provided under it during its term. The Gas and Electric Light Company later acquired the franchise by purchase, and in December, 1920 notified the consumers of gas within the city that from and after January, 1921 it would charge them for such gas at a rate higher than the maximum rate prescribed in the franchise ordinance. The city brought an action to enjoin the threatened increase. The district court granted the injunction and the Supreme Court affirmed that ruling. It based its ruling squarely upon the premise that the franchise ordinance duly accepted, of which the rate section was an essential part, constituted "a contract the obligation of which may not be impaired by either party".

In reaching that conclusion the court held that under the applicable statute, Section 1708, C.S.Neb.1909,[13] cities of the second class in 1909 had no power to regulate rates for the service of gas to their inhabitants. But it further held that the rate provisions of the ordinance were a plain and binding contract.

Obviously the 1911 amendment now reflected in Section 17–125, supra, though enacted eleven years before, was not at all involved in, the decision in the City of University Place case. Despite that, the opinion, by way of dictum said of the power to regulate rates:

"* * * such power was not granted until 1911. Rev.St.1913, § 5019."

And elsewhere in the opinion, e. g., 109 Neb. at page 380, 191 N.W. 432, the thought is advanced that the amendment of 1911 conferred on cities of the second class a rate regulatory power, theretofore nonexistent. It is to be noted, however, that the writer of the opinion advances no view touching the extent of or limitation upon the power.

The problem came to this court, and on appeal to the Court of Appeals, Eighth Circuit, in Nebraska Gas & Electric Co. v. City of Stromsburg, 8 Cir., 2 F.2d 518. The Gas and Electric Company owned an electric service franchise for the term of twenty years granted by an ordinance of City of Stromsburg on April 3, 1917 and duly accepted and exercised by the grantee thereof and by Gas and Electric Company as its successor. The franchise ordinance prescribed maximum rates. The first world war shortly intervened. In recognition of its burden of added operating expense, the city council by resolution adopted March 16, 1920 authorized the collection of rates for electric energy twenty-five per cent higher than those prescribed by

13. By which the city was authorized " 'to grant a franchise to and *make a contract with* any person, company, or association for the privilege of granting to such person, company or association the furnishing of light for the streets, lanes, alleys and other public places and property of said city and the inhabitants thereof, and to levy a tax for the purpose of paying the costs of such lighting the streets, lanes, alleys, and other public places and property of said city; and the furnishing of power to the residents, citizens and corporations doing business in such city.' "

The foregoing emphasis is reflected in the cited opinion, which was written by the Honorable William A. Redick, District Judge, serving by assignment with the Supreme Court. He was one of the most distinguished judges ever to serve in the state's judicial system.

the franchise ordinance. But on November 1, 1921 it adopted a further resolution rescinding its action of March 16, 1920. The city then brought an action to enjoin the Gas and Electric Company from failing and refusing to conform its rates to those prescribed in the franchise ordinance. This court, by the Honorable Thomas C. Munger, then its senior judge, granted the city the relief it sought. The Gas and Electric Company appealed and the Court of Appeals reversed and remanded the case for trial upon the issue of the confiscatory character of the franchise rates.

The ruling of the Court of Appeals can not be considered to disclose a pattern of decision in which all, or even a majority of the judges concur. Judge Faris, then a district judge, wrote the opinion announcing the action of the court. Circuit Judge Lewis filed a dissenting opinion. Senior Circuit Judge Sanborn concurred in the result arrived at by Judge Faris, but apparently not in his opinion. The franchise ordinance, though prescribing a schedule of maximum rates for its duration, reserved to the city alone the option to initiate at designated intervals during its term proceedings in the nature of arbitration for the revision of the rate schedule. No comparable option was accorded the Gas and Electric Company. In his opinion, Judge Faris criticised as obiter dictum, and refused to follow or recognize, the language above quoted from the opinion of the Supreme Court of Nebraska in the City of University Place case, and later, at page 523, expressly declared that Section 5019, R.S.Neb.1913, now Section 17–125, R.S.Neb.1943, Re-

issue of 1954, does not grant the power to regulate rates.

But, except for the consequence of the Stromsburg ordinance's language reserving to the city the unilateral right to initiate periodical review of the maximum rates during the term of the franchise, the opinion of Judge Faris held that the provisions of the grant of a franchise including the maximum rate structure constituted a contract mutually binding on the city and the Gas and Electric Company. And to that extent neither Judge Sanborn nor Judge Lewis appears to have differed with him.[14] Nor, it would seem, had Judge Munger entertained a different view. That, too, is the essential ruling of the Supreme Court of Nebraska in City of University Place v. Lincoln Gas & Electric Light Co., supra. And in 1948 that court in Clough v. North Central Gas Co., 150 Neb. 418, 34 N.W.2d 862, 866, speaking of the character of gas franchise ordinance,[15] said:

"Ordinance No. 110 constitutes a contract between the city of Minatare and the defendant gas company. See City of University Place v. Lincoln Gas & Electric Light Co., 109 Neb. 370, 191 N.W. 432. The authorities are practically united that ordinarily a grant to a gas company of the right to supply gas and to use the streets is a franchise and, after its acceptance and performance, becomes a contract."

See also, though not in relation to a city of the second class, Omaha Gas Co. v. City of Omaha, D.C.Neb., 249 F. 350.

Counsel for plaintiff argue earnestly that at the times of the adop-

---

14. Judge Sanborn's concurrence in the result assuredly reflected no such difference of view. And Judge Lewis' dissent was not on the ground of any such difference. On the contrary, he not only recognized the contractual character of the franchise ordinance, including its rate provisions, but insisted that the reservation to the city alone of the right periodically to reopen the rate issue, through resort to an arbitration procedure, was not effective to introduce into the contract a fatal

want of mutuality. Judge Faris' opinion, though insisting that the rate provision was a contract, declared that the city's unilateral right to insist upon review from time to time of the rate schedule destroyed the essential mutuality of the contract. And on that account he supported the reversal in which Judge Sanborn concurred.

15. Though, admittedly, not in direct relation to its rate provisions.

tion of the several franchise ordinances under consideration the several defendant cities had the power to regulate the rates to be charged by franchise holders for natural gas by them sold to inhabitants of the several municipal areas.[16] That premise does not appear to be disputed by defendants and it is by the court considered to be true, though with the manifest limitations reflected in Section 17–125, R.S.Neb.1943, Reissue of 1954. (In passing it may be noted that no state board or bureau in Nebraska possesses such authority.) Then, emphasizing the real distinction between the power to regulate such rates and the power to contract touching them, see Home Telephone & Telegraph Co. v. City of Los Angeles, 211 U.S. 265, 29 S.Ct. 50, 53 L.Ed. 176, it questions the valid contractual character of the several franchise ordinance rate sections. The challenge appears to the court not to be well taken. Despite the patent disparity between the power to regulate gas rates and the power to contract concerning them, no reason would seem to exist why both functions may not reside concurrently in the same public body. Nor is there any obstacle to the attainment by the rate regulatory provision of a franchise ordinance, of the status of a contract upon the acceptance and enjoyment of the franchise by its beneficiary. City of Texarkana, Tex. v. Arkansas Louisiana Gas Co., 306 U.S. 188, 59 S.Ct. 448, 83 L.Ed. 598.

■ It is particularly easy to understand that, within the quoted language of Section 17–125, R.S.Neb.1943, Reissue of 1954, a rate provision, embodied in and continuing for the duration of, a gas franchise, accepted and exercised by the franchise grantee, becomes a contract between the granting municipality and the holder of the privilege. The observance of the rate prescriptions is a manifest condition of the exercise of the franchise. And this view is supported by the foregoing expressions of Nebraska's court, of this court and of the court of appeals for the eighth circuit, as well as by the observations of the Supreme Court of the United States in the case last cited.

In the face of the last cited statute, too, and of the positive provisions of each rate section now involved[17], the court does not consider that the contractual contentions of the defendants are to be rejected as repugnant to the general rule whereby a municipality, clothed by legislative enactment with the power to fix and determine rates, is held not to be authorized to abandon that power either by contract or by the initial prescription of rates for the duration of a franchise. Home Telephone & Telegraph Co. v. City of Los Angeles, supra; City of Texarkana, Tex. v. Arkansas Louisiana Gas Co., supra. The several defendant cities seem to the court to have exercised the precise power statutorily entrusted to them in the exact manner of its bestowal.

Upon the issue of the status, as binding and enforceable contracts, of the several franchise ordinances, the court's holding is, therefore, with the defendants.

The issue most sharply in controversy upon the final submission of the cases is the power of this court to enter judgments of the kind prayed for by plaintiff. In support of their denial both of such power and of the court's jurisdiction over the actions, defendants rely upon Title 28 U.S.C. § 1342. That sec-

---

16. That cities of the second class now possess such power is conceded. See L.B. 378, Session Laws of Nebraska for 1955, approved April 22, 1955 and discussion, infra.

17. It may be appropriate to note here that the current franchise rate prescriptions are not inflexible and intolerant of change. Each such rate section provides, before its schedule of rates, that

"Grantee shall file and make effective initially the schedule of maximum rates for natural gas service set forth below, and shall furnish natural gas at such rates, or at such other reasonable, lawful, and valid rates as may hereafter be established from time to time by Grantee, subject to the approval of the proper body having jurisdiction over such rates for gas service in said city."

tion, commonly known as the Johnson Act, has been in effect since May 14, 1934, 48 Statutes at Large 775, and is in the following language:

"§ 1342. Rate orders of State agencies

"The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

"(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

"(2) The order does not interfere with interstate commerce; and,

"(3) The order has been made after reasonable notice and hearing; and,

"(4) A plain, speedy and efficient remedy may be had in the courts of such State."

The court is not vitally concerned whether the quoted statute is operative to withdraw jurisdiction from the district courts in the circumstances defined or, while conceding jurisdiction, to nullify its exercise by denying the power to enter an affirmative judgment. In either supposition the practical result is the same. Upon principle the writer has always been disposed to regard such congressional enactments as the limitation pro tanto of the jurisdiction of the inferior court involved, whose jurisdiction is constitutionally dependent upon the legislative will. The denial of the judicial power to grant the only kind of relief which a moving party may practicably seek seems to be effective to intercept jurisdiction.

At this point another clarifying reflection should be offered. It has to do with the substance of plaintiff's prayers. It asks primarily in each case for an "order of this court directed to the defendants, enjoining the defendants from preventing the plaintiff from putting the rates set forth in Exhibit "B" attached hereto into effect and collecting the same." (quotation from No. 88–54, Omaha). The rest of the prayer is merely subsidiary to that first demand. Now, in the light of the record before the court in each case, to the accomplishment of that objective it would be necessary to "enjoin, suspend or restrain the operation of, or compliance with" each of the several rate structures embodied in the franchise ordinances. So, what each action essentially seeks is really the invalidation of the applicable franchise rate section. In this relation, plaintiff argues that the municipal action whose enforcement it aims to enjoin is the recent refusal of the council of each city to grant the requested rate increase and to adopt one or the other of the proposed methods appropriate to that end. That argument has more ingenuity than virtue. It is completely unrealistic. The refusal to grant the requested increase on the part of each council resulted in no actual change; it left the matter of rates where it was before plaintiff's request for an increase. And that position was reflected in the franchise rate section. So long as that rate section remains unamended, unrepealed and immune to injunction, it declares the legal rate basis within the city for which it was adopted. An increase in rates may be secured only by its amendment or suspension. What plaintiff asks in substance, therefore, is its nullification.

It must be clear that by the plain terms of Title 28 U.S.C. § 1342, it is necessary to its applicability, first, that the rate sought to be intercepted have been "made by a State administrative agency or a rate-making body of a State political subdivision," and secondly, that all four of the numbered conditions be found to exist. The existence of one or less than all of those conditions will not suffice.

■■■ Since no rate made by a state administrative agency is involved, the first question under the Johnson Act is whether by Nebraska's law at the time of the enactment of each franchise ordi-

nance the council of a city of the second class was a rate-making body of a state political subdivision. Such city was unquestionably a state political subdivision. No one argues otherwise. And the court has concluded that its council was also the rate-making body with jurisdiction over the city's area. Section 17–125, R.S.Neb.1943, Reissue of 1954, supra, seems clearly so to declare, although it circumscribes quite narrowly the exercise of the rate-making power. It not merely authorizes, but positively requires, such a city on the grant of a franchise for a term of years within its allowance, "to fix", by such franchise, "the amount that may be charged during such period for such gas", and, also by such franchise, to "provide that such city may, after such period, make any reasonable regulation * * * either as to charges for such gas * * * or otherwise." The power of the city is by franchise provision to *fix*—and that means to *make*—rates for the term of the franchise, and thereafter to make any reasonable regulation as to charges. How, it may be wondered, could the power to make rates be more positively declared? Besides, the state's Supreme Court, in City of University Place v. Lincoln Gas & Electric Light Co., supra, indicated its understanding that the amendment of 1911, whereby Section 17–125 came into its present form, vested cities of the second class with rate making power. This court has not overlooked the rejection of that view in Judge Faris' opinion in Nebraska Gas & Electric Co. v. City of Stromsburg, supra. But under the teaching of Erie R. Co. v. Tompkins, supra, and especially of Yoder v. Nu-Enamel Corp., 8 Cir., 117 F.2d 488, this court in determining the posture of Nebraska's law must give heed to the deliverances of its Supreme Court; and that is true even though they be found in considered dicta rather than in direct decisions. It must prefer that source, rather than the contrary view of a judge of this federal circuit. The thought may be pursued a bit farther. Nebraska Gas & Electric

Co. v. City of Stromsburg, supra, was decided before Erie R. Co. v. Tompkins, supra. If Judge Faris were writing now, he would not be at liberty to reject Judge Redick's appraisal of the law of Nebraska on the ground that it was dictum, and it is probable that his opinion would not question the city's rate-making power. The several cities, through their respective councils are, therefore, held to be rate-making bodies.

The court's ruling in that behalf has not been influenced through the enactment by the legislature of Nebraska of c. 41, approved April 22, 1955. In that act it was provided that,

> "Cities of the second class and villages shall have power to regulate and fix the rents or rates of gas, and to regulate and fix the charges for gas meters or other device or means necessary for determining the consumption of gas."

That measure was not adopted until after the institution of these suits; and since it was passed without the emergency clause, it is not even yet in effect. The law of Nebraska upon the question is appraised as of the times of enactment of the several franchise and rate ordinances. Incidentally, such law remains unchanged to this date.

It is necessary next to consider the four numbered conditions to the operation of Title 28 U.S.C. § 1342.

The first of those conditions is clearly present. Jurisdiction in these actions is based solely on diversity of citizenship *and* the repugnance of the prevailing rate ordinances, severally considered, to the federal constitution. The court does not suppose that the concurrence of those two jurisdictional grounds should be regarded as odious to subsection 1 of section 1342 in which they are identified disjunctively.

The court also considers that the rate provisions of the ordinances do not interfere with interstate commerce.

After some years of relative inconsistency upon the question, the Supreme Court seems now unquestionably to char-

acterize as interstate commerce the sale of natural gas to purchasers for consumption, by a gas company which has brought it by pipe line from another state for the purpose, among possible others, of such sale. Pennsylvania Gas Co. v. Public Service Commission,[18] 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434, affirming 225 N.Y. 397, 122 N.E. 260; Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549; Illinois Natural Gas Co. v. Central Illinois Public Service Co., 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371; Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128; Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993.

Despite that characterization of sales for consumption as interstate commerce and, therefore, their amenability in the discretion of the Congress to federal regulation, the Natural Gas Act, 15 U.S. C.A. § 717 et seq. (see especially Section 717b) provides that:

> "The provisions of this chapter shall apply to the * * * sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such * * * sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas."

The Congress thus left to the states the problem of regulating the local distribution and marketing and the sale price of natural gas, notwithstanding its importation for that purpose in interstate commerce. Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, supra, and Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, supra.

To be sure, the power to regulate the price of that commodity is not without its safeguards and limitations. If the regulation be so administered as to result in confiscation, in the taking of the seller's property without just compensation or due process of law, it may be judicially intercepted or corrected. And it is invalidly exercised if, by providing unfairly low rates upon local distribution, it results in the imposition of excessive burdens upon the seller's interstate operations. A finding of rate inadequacy producing such results or some of them may well afford the basis in an appropriate forum for the interposition of equity to intercept improvident regulation. But in the context of the Johnson Act, it is not believed that mere inadequacy of a local rate prescribed by competent authority for natural gas imported by interstate pipe line "interfere[s] with interstate commerce". Minnesota Rate Cases, Simpson v. Shepard, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, is pressed upon the court as authority to the contrary. But, fully understood, that opinion does not appear to this court to require a conclusion different from that just expressed. In its reasoning it related interference with interstate commerce to the imposition of a direct burden upon such commerce. See also Missouri Rate Cases, Knott v. Chicago, B. & Q. R. Co., 230 U.S. 474, 33 S.Ct. 975, 57 L.Ed. 1571. Pennsylvania Gas Co. v. Public Service Commission, supra; Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co., supra. That the rate prescriptions of the several ordinances, indirectly and incidentally affect interstate commerce may be granted; it does not follow therefrom that they interfere with such commerce.

Mention may also be made of the recently reported case of General Telephone Co. of Southwest v. Robinson, D.C. Ark., 132 F.Supp. 39. In it the Telephone Company sought to enjoin the

---

**18.** Observe its criticism and disapproval in East Ohio Gas Co. v. Tax Commis-

sion, 283 U.S. 465, 51 S.Ct. 499, 75 L.Ed. 1171.

enforcement of an order of Arkansas Public Service Commission fixing rates chargeable in Arkansas by a telephone company maintaining in the border city of Texarkana an integrated exchange from which subscribers were served, both in Western Arkansas and in Eastern Texas. A three judge court held that the commission's order, applicable only to Arkansas rates, did not interfere with interstate commerce. And upon that ground it held the Johnson Act to be applicable, and the suit to be outside federal court jurisdiction and dismissed the action. And the court also concluded that, even if it were mistaken and actually possessed jurisdiction, it ought as a matter of comity to decline to exercise the jurisdiction and to remit the parties to their state remedies. See also Alabama Public Service Commission v. Southern Ry. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002. It may be of interest to observe that one of the judges acting in the General Telephone Co. case, though not the writer of the opinion, was at the time of the enactment of Title 28 U.S.C. § 1342, a member of the National House of Representatives (later a United States Senator) and as such took an active part in the modification into the form in which it was finally passed of the bill which became the Johnson Act. Specifically, he sponsored the amendment which brought within its reach "rates * * * made by * * * a rate-making body of a State political subdivision" for the declared purpose of protecting, under the Act, rates made by city councils as well as those made by state commissions.

■ Leaving for final consideration, the third subsection, brief attention may be given to the fourth. It is not seriously denied that a plain, speedy and efficient remedy may be had in the courts of Nebraska for the alleged wrong of which plaintiff complains. Such remedy clearly exists in the equity courts of the state and it is plain, speedy and efficient. Such courts have the power and the duty to enter orders to prevent the confiscation of plaintiff's property in violation of the constitution of the United States. And upon federal constitutional issues the Supreme Court of the United States may review the rulings of the highest court of the state. Recognition may be taken also of the fact that no congestion of dockets or insuperable case load foreshadows unreasonable delay in the prosecution of litigation in the state's courts. They are abreast of their tasks.

It remains to be considered whether the application of the Johnson Act is obviated under its third subsection, which prescribes the condition that the order must have "been made after reasonable notice and hearing". The circumstances in which the franchise ordinances and the amendatory rate ordinance in No. 521 Grand Island were passed have already been sufficiently recalled and need not be repeated. The court would ordinarily hold that, in the face of the present attack, they reflect reasonable notice and hearing.

But counsel for plaintiff insist that, because Nebraska by its statutes does not provide for and define "reasonable notice and hearing" as an imperative preliminary to action such as was taken by the several city councils, it is immaterial whether any notice or hearing actually occurred prior to the enactment of any of the ordinances involved. They argue that such notice and hearing must be prescribed by general law and not left to the discretion or indulgence of the city council. They rely largely upon Mississippi Power Co. v. City of Aberdeen, D.C.Miss., 11 F.Supp. 951 which clearly supports their position in direct relation to the Johnson Act. Impairing its persuasiveness is Mississippi Power & Light Co. v. City of Jackson, Miss., D.C.Miss., 9 F.Supp. 564, in which the court of a different federal judicial district in Mississippi held that the Johnson Act was applicable under the Mississippi statute and that the critical question was whether in the case examined the rate-making body had afforded what actually constituted reasonable notice and hearing complying with the

minimum requirements of due process of law. In addition to the latter case defendants' counsel rely on East Ohio Gas Co. v. City of Cleveland, D.C.Ohio, 23 F. Supp. 965, affirmed 6 Cir., 94 F.2d 443, certiorari denied 303 U.S. 657, 58 S.Ct. 761, 82 L.Ed. 1116. See also, though not in a rate controversy, Phipps v. School District of Pittsburgh, 3 Cir., 111 F.2d 393, affirming D.C., 26 F.Supp. 811.

Of the two opinions from Mississippi federal district courts, this court is disposed to accept the City of Jackson case as the more soundly reasoned. It agrees that what the Johnson Act requires is the giving of such notice and the allowance of such hearing as are adequate to meet the minimum standards of due process. And while, as plaintiff's counsel contend, East Ohio Gas Co. v. City of Cleveland, supra, may be narrowly distinguished from the Mississippi cases— and these—upon the basis of the existence in Cleveland's city charter of a requirement for notice and hearing which was complied with, the reasoning in that case, based upon the legislative character of the rate-fixing function, supports the view that what eventually matters is the actual giving of notice and allowance of hearing.

Home Telephone & Telegraph Co. v. City of Los Angeles, supra [211 U.S. 265, 29 S.Ct. 54], was decided in 1908, and, therefore, had no reference to the Johnson Act. But it did consider the requirement of reasonable notice and hearing in a manner which is presently instructive. Upon the subject it said:

"The appellant also contends that the ordinances fixing rates are wanting in due process of law, and therefore violate the 14th Amendment of the Constitution of the United States, because the section (31) of the charter, under whose authority they were enacted, does not expressly provide for notice and hearing before action. But rate regulation is purely a legislative function and, even where exercised by a subordinate body upon which it is conferred, the notice and hearing essential in judicial proceedings and, for peculiar reasons, in some forms of taxation (see Londoner v. [City & County of] Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103), would not seem to be indispensable. It may be that the authority to regulate rates, conferred upon the city council by § 31 of the charter, is not an authority, arbitrarily, and without investigation, to fix rates of charges, and that, if charges were fixed in that manner, the act would be beyond the authority of the council. It is not unlikely that the California courts would give this construction to the ordinance. San Diego Water Co. v. [City of] San Diego, 118 Cal. 556, 50 P. 633, 38 L.R.A. 460. Acting within the authority thus limited it would seem that the character and extent of the investigation made and notice and hearing afforded, in the exercise of this legislative function, would be left to the discretion of the body exercising it. It must not be forgotten that, presumably, the courts of the states, and certainly the courts of the United States, are open to those who complain that their property has been confiscated by an act of regulation of this kind, and that the latter courts will, under all circumstances, determine for themselves whether such confiscation exists. But we need not now decide whether notice and hearing were required. Both were given in this case. An ordinance of the city provided that the rates should be fixed at a regular and special meeting of the city council held during the month of February of each year, and another ordinance, as has been shown, required the telephone company to render annually, in the month of February, to the city council, a statement of its receipts, expenditures, and property employed in the business,—facts which would be material on the

question of fixing reasonable rates. This shows that a sufficient notice and hearing were afforded to the appellant, if it had chosen to avail itself of them, instead of declining to furnish all information, as it did. If notice and an opportunity to be heard were indispensable, which we do not decide, it is enough that, although the charter be silent, such notice and hearing were afforded by ordinance, as in this case. So, it was held in Paulsen v. [City of] Portland, 149 U.S. 30, 38, 13 S.Ct. 750, 37 L.Ed. 637, 640, and it was held in San Diego Land & Town Co. v. City of National City, 174 U.S. 739, 19 S.Ct. 804, 43 L.Ed. 1154, that the kind of notice and hearing (in that case provided by statute) which the ordinance in this case afforded was sufficient. For these reasons the contention of the appellant on this part of the case is denied."

United Gas Corporation v. City of Monroe, D.C.La., 46 F.Supp. 45, and Georgia Continental Telephone Co. v. Georgia Public Service Commission, D. C.Ga., 8 F.Supp. 434, cited and discussed in the briefs are not instructive for in each of them the court perceived a failure in fact to give any real notice or provide a hearing.

In footnote 6 of its opinion filed April 20, 1955, 135 F.Supp. 629, the court discussed and rejected an argument in behalf of plaintiff to the effect that Nebraska decisions support its view upon this branch of the cases. The thought there expressed is adhered to and need not be formally repeated.

■■■ It is the opinion of the court that, within the meaning of subsection (3) of Title 28 U.S.C. § 1342, each ordinance on which defendants rely was adopted after reasonable notice and hearing; and more than that is not required. It has to be remembered that the Congress in enacting that statute had in contemplation the rate-making actions of forty-eight states and of almost uncounted subdivisions of those states. It, therefore, prudently spoke in broad generality in subsection (3). And it is not within the province of this court to narrow that generality by construction.

A final reflection upon this point is in order. What plaintiff presently assails are not rate-reducing ordinances thrust upon it by the municipalities against its will or without its notice or knowledge. Directly to the contrary, they are provisions of franchise ordinances proposed, prepared and actively and successfully solicited by plaintiff. It is in no position at this late date, to question the adequacy or validity of the notices or hearings underlying those ordinances. It may not thus absurdly repudiate its own conceptions.

The court should not, in its administration of the Johnson Act, appraise it too narrowly or harshly. It should be regarded with due appreciation of the history which evoked it. A familiar practice had long been pursued by investors in public utilities. They erected corporations in distant states through which they engaged in the provision of public services entirely in areas bearing no relation to the incorporating states. Much too frequently, the possibility of their resort to the federal courts in litigation, including, but by no means limited to, rate controversies, was a controlling factor in the selection of the corporate domicile. Then, when an unwelcome rate prescription was made within its operating area, the corporate public service agency would bring the local authorities into the courts of the United States rather than the state courts. And the impression had grown and, whether true or not, had attained formidable recognition, that they proceeded in that fashion because of an intolerable tenderness towards them deducible from federal court rulings. In such an atmosphere suspicion and resentment were inevitably inspired; and a majority of the Congress resolved upon the correction of the abuse. The Johnson Act was their instrument.

It does not deny any public service corporation the redress of an actual grievance. Nor does it intercept the final review by the Supreme Court of the United States of any federal question. But it does operate to require that, except on rare occasions, it must seek its relief in the first instance in the courts of the state by whose authorities its rates have been determined and from whose citizens its revenues are collected, with the right of review in appropriate circumstances by the Supreme Court of the United States. While it may be recognized as historically true that several of the senators who notably supported the Act were frankly hostile to the allowance to the United States District Courts of any diversity jurisdiction, that fact is of no present significance. The Act is the law. It speaks for itself. And it is to be administered ungrudgingly, even liberally on the score of its remedial character.

By way of conclusion upon the issue it may be said simply that the court considers that Title 28 U.S.C. § 1342 is applicable in these cases.

It may be observed that the court readily agrees that plaintiff is without an adequate remedy at law for the redress of such grievances as it advances. No question has arisen on this point.

Because of its conclusion that the Johnson Act reaches each of these cases, and of its further holding that the rate provisions of each franchise ordinance is, under Nebraska law a contract binding on the parties, the court is entering in each case an order dismissing the action at plaintiff's costs.

The original of this memorandum, applicable alike to all four cases, will be filed in the former No. 88–54 Omaha Division; and in each of the former Grand Island Division cases the clerk will make appropriate filing of a notation or memorandum directing attention to the former No. 88–54 Omaha Division, for the contents hereof.